643 P.2d 997 (1982)
S.O., Natural Mother, Appellant,
v.
W.S. and P.S., Adoptive Parents, Appellees.
In the Matter of the ADOPTION OF J.D.S., a Minor.
No. 5856.
Supreme Court of Alaska.
April 30, 1982.
*999 Kneeland Taylor, Anchorage, for appellant.
Max F. Gruenberg, Anchorage, for appellees.
John Reese, Virginia Bonnie Lembo, Law Offices of John Reese and Wilson A. Rice, P.C., Anchorage, as Guardian Ad Litem, for J.D.S.
Before RABINOWITZ, CONNOR, MATTHEWS and COMPTON, JJ.

OPINION
MATTHEWS, Justice.
About five months prior to her son's birth, S.O. resolved that she would give her child up for adoption. Expecting to be hired for a job on the North Slope, S.O. felt that she would be unable to give the child the love and attention it would need. She also thought it important for a child to grow up in a two parent home, which she could not provide as she did not intend to continue her relationship with the child's natural father.
S.O. initially investigated the possibility of an agency adoption and contacted the Department of Health and Social Services and Catholic Social Services. When she asked for information about prospective adoptive parents both agencies told her that the agency makes the placement decision and therefore could not give her the type of information that she sought. The agencies suggested that she consider a private placement if she wanted to influence the selection of the adoptive parents.
Sometime in May 1980, the natural father's mother and stepfather learned of S.O.'s pregnancy and her intention to have *1000 the unborn child adopted. They also learned that she had contacted an attorney to whom she had given a questionnaire for prospective parents to answer, but had as yet received no response. They told S.O. that some friends of theirs, W.S. and P.S., wanted to adopt a child so S.O. gave them a copy of the questionnaire to give to W.S. and P.S. to fill out. In accord with S.O.'s request, the couple's name was not disclosed to her.
On the following day the completed questionnaire was returned to S.O. and, upon reviewing the responses given by W.S. and P.S., she decided that they would be suitable adoptive parents. At the suggestion of the natural father's mother and stepfather, S.O. contacted attorney Wayne Ross, who, S.O. was informed, had had experience with adoption matters. Mr. Ross was to represent S.O. in the adoption, but his fee was to be paid by the adoptive parents, W.S. and P.S.
W.S. and P.S. retained as their attorney Frederick Pettyjohn, who suggested that the required agency home study[1] be conducted by the Department of Health and Social Services. However, aware that W.S. and P.S. had once unsuccessfully tried to adopt a child through Catholic Social Services, Mr. Ross insisted that that agency do the home study. Mr. Pettyjohn assented, and so Catholic Social Services did the study and approved W.S. and P.S. as adoptive parents.
A copy of the study was sent to Mr. Ross accompanied by a letter from the agency stating that the contents of the report were not to be divulged to his client. Nonetheless, Mr. Ross phoned S.O. and told her that the agency had given its approval and read her various portions of the report praising W.S. and P.S. as prospective parents. However, he omitted all references to the couple's past effort to adopt a child and to an earlier drinking problem of P.S., the adoptive mother.
On the evening of July 22, 1980, S.O. gave birth to J.D.S. The following morning, while still at the hospital, S.O. signed a document entitled "Relinquishment of Parental Rights" in the presence of Mr. Ross, a notary and several others. The document purported to terminate the parent-child relationship between S.O. and her child and grant custody of the boy to Mr. Ross with authorization to take all steps necessary for the child's adoption. On that same day, Mr. Ross signed a document entitled "Release and Consent," which was also notarized and purported to relinquish any claim Mr. Ross had to the child and to give his consent to the child's adoption by W.S. and P.S. Shortly after S.O. left the hospital, Mr. Pettyjohn picked up J.D.S. and delivered him to the adoptive parents, with whom he has lived ever since.
On August 7, 1980, W.S. and P.S. filed a petition for adoption in the superior court. By letter dated August 12, 1980, Master Andrew Brown informed Mr. Pettyjohn that he would not schedule a hearing on the petition as the relinquishment signed by S.O. was not executed before an agency or court as required by AS 20.15.180(b)(1).[2] Mr. Pettyjohn contacted Mr. Ross and informed him of the problem at which point Mr. Ross' office contacted S.O. and asked her to come in and arrange to sign another relinquishment before a judge.
It appears that about a week after giving birth to J.D.S., S.O. had attended a Christian fellowship at which she was "saved." She decided to attend Bible College and thus abandoned her plans to take a job on the North Slope. She also began to have misgivings about her decision to give up her child but believed that the adoption had gone through. When she learned that it had not, she decided that she wanted J.D.S. returned to her.
*1001 On August 29, 1980, S.O., represented by different counsel, filed in superior court a withdrawal of consent pursuant to AS 20.15.070(b).[3] On September 5, she filed a motion for the return of her child. On September 19, Superior Court Judge Ripley signed a pretrial order setting a hearing for October 6, 1980, and appointing a guardian ad litem to represent J.D.S. It was at about this time that S.O., through discovery, first learned that the adoptive mother had once had a drinking problem.
The hearing was held before Master Marjorie Bell and, being heard on a time-available basis, lasted nearly two months.[4] Pursuant to an agreement between the parties, J.D.S. remained in the custody of the adoptive parents, but S.O. was allowed visitation. After considering the written final arguments, including one submitted by the guardian ad litem in favor of the adoption, Master Bell issued a report recommending that the petition for adoption be granted. Pursuant to S.O.'s motion for rejection of the Master's report, a hearing was held before Judge Ripley on February 13, 1981. On February 16 he ordered that the Master's findings be adopted, that a decree of adoption enter, and that S.O. be allowed continued reasonable visitation with J.D.S. pending the outcome of a timely appeal. The superior court awarded W.S. and P.S. $8,000 in attorney's fees and assessed S.O. costs amounting to $922.10.
On appeal, S.O. asserts that the lower court erred in finding that she validly consented to the adoption of her son by W.S. and P.S. She also claims that it was error to refuse to let her withdraw her consent to the adoption. Finally, she claims that the award of costs and attorney's fees is not authorized by Civil Rule 82 and violates her due process and equal protection rights under the Alaska and United States Constitutions.

I
AS 20.15.040(a)(1) requires a natural mother's written consent to her minor child's adoption before a petition to adopt may be granted.[5] AS 20.15.060 specifies how such consent is to be executed.
(a) The required consent to adoption shall be executed at any time after the birth of the child in the presence of the court or in the presence of a person authorized to take acknowledgements.
(b) A consent which does not name or otherwise identify the adopting parent is valid if the consent is executed in the presence of the court or a person authorized to take acknowledgements and contains a statement by the person whose consent it is that the person consenting voluntarily executed the consent irrespective of disclosure of the name or other identification of the adopting parent.
The document signed by S.O. shortly after her son's birth satisfies the requirements of subsection (a). It does not, however, name or otherwise identify W.S. and P.S. as the adoptive parents nor contain a statement that S.O. waived such disclosure. *1002 The Master nonetheless found that S.O. effectively consented to her son's adoption. Our task is to determine whether the failure to comply strictly with AS 20.15.060(b) vitiates S.O.'s otherwise valid consent.[6] We hold that it does not.
The record shows that S.O. did not want to know the identity of the adoptive parents. In addition, the Master found, and this finding is not disputed, that S.O. signed the document in question with W.S. and P.S. in mind and that she would have signed it had it contained a statement waiving disclosure of their identity. Under these circumstances we decline to hold that the technical failure to comply with AS 20.15.060(b) nullifies S.O.'s otherwise valid consent. When, as here, it is clear that the statutory purpose has been fulfilled, substantial compliance with the requirements governing consent to adoption is sufficient.[7]See Hall v. Hayes, 441 S.W.2d 275, 277 (Tex.Civ.App. 1969); Cohen v. Janic, 57 Ill. App.2d 309, 207 N.E.2d 89, 91 (1965). See also Application of Hendrickson, 159 Mont. 217, 496 P.2d 1115, 1118 (1972).
S.O. also maintains that her consent to the adoption is invalid because it was induced by misrepresentations and omissions of critical information. She argues that the answer given by P.S. and W.S. to the first question of the questionnaire she prepared was incomplete and deceptive.[8] She also claims that Mr. Ross deceived her when, in reading to her portions of the Catholic Social Services study, he failed to mention that P.S. once had a drinking problem and that the adoptive parents had been unsuccessful in their earlier attempt to adopt a child through that agency.[9]
*1003 The first question that appears on S.O.'s questionnaire asks:
Do you consume alcoholic beverages? How often and how much?
The response given by W.S. and P.S. states:
My husband and I generallt [sic] enjoy a drink at the end of the work day, prior to the dinner hour. Other social functions which include alcoholic beverages are restricted almost exclusively to informal gatherings in our home or the home of friends. Rarely do we patronize bars, cocktail lounges and the like.
S.O. contends that this answer is untrue since P.S. admitted in her deposition to drinking two drinks a day during the week and sometimes more on weekends and social occasions. She also claims that the answer is misleading in that it does not disclose that P.S. had had a drinking problem in the past. The Master found that S.O. "wanted to know whether petitioners were alcohol abusers. She got the answer they were not, but were social users, and the evidence elicited during the hearing substantiated this." The Master therefore concluded that S.O. was not misled by the adoptive parents' response. We agree.
The answer to S.O.'s question states that the adoptive parents generally have a drink before dinner on weeknights. There was testimony that on some evenings no alcoholic beverages were consumed. There was also testimony that P.S. often drank only part of her drinks so that her actual intake was frequently less than two drinks. According to her testimony, S.O. asked about alcohol consumption because her father had been an alcoholic when she was a child. The evidence elicited at the hearing indicates that the adoptive mother does not currently abuse alcohol and that her previous drinking problem ceased over four years ago. In light of this evidence, we see no merit in S.O.'s contention that the Master's finding of general accuracy is clearly erroneous. See Martens v. Metzgar, 591 P.2d 541, 544 (Alaska 1979).
Nor are we persuaded that the adoptive parents misled S.O. by not disclosing P.S.'s past drinking problem in answering S.O.'s question. The question is phrased in the present tense. We do not think it misleading in responding to an inquiry regarding present alcohol consumption to omit reference to a problem with alcohol that ceased to exist four years earlier.[10]
Finally, with respect to the alleged concealment of material facts by S.O.'s attorney, Mr. Ross, we note that the Master made no specific finding on this issue. However, given the Master's recommendation that the petition for adoption be granted, it is apparent that she felt that Mr. Ross' omissions were not sufficiently material to justify setting aside S.O.'s consent. We agree with S.O. that the fact that he was her attorney is not decisive; a consent to adoption procured by fraud is void, and the relationship of the party perpetrating the fraud to the natural parent is irrelevant. 2 Am.Jur.2d, Adoption, § 44 (1962). We conclude, however, that the Master's implicit finding that S.O. was not materially misled by Mr. Ross is not clearly erroneous.
*1004 Mr. Ross testified that S.O. did not inform him of her feelings about alcohol use. He also testified that he had never seen the questionnaire prepared by S.O. At no time did S.O. contradict this testimony and she does not dispute its truth on appeal. Under these circumstances, Mr. Ross had no reason to believe that his client would withhold her consent had she known of the past drinking problem. The Catholic Social Services report found that P.S.'s drinking had ceased to be a problem four years earlier and that W.S. and P.S. would be suitable adoptive parents. In reading to S.O. portions of the report which the agency had requested be kept confidential, Mr. Ross testified that his main concern was that S.O. know that the adoptive parents could provide a good home for her child. That Mr. Ross insisted the home study be done by the agency which he knew had put the adoptive parents' earlier application to adopt on hold indicates that he had no inappropriate loyalty to them. The agency believed that P.S.'s problem was no longer of consequence and this, according to Mr. Ross, convinced him that the matter was not important. Acceptance of this view of the facts was not clearly erroneous.

II
S.O. also argues that even if she did consent to her son's adoption, it was error not to permit her to withdraw that consent. AS 20.15.070(b) provides:
A consent to adoption may be withdrawn before the entry of a decree of adoption, within 10 days, by delivering written notice to the person obtaining the consent, or after the 10-day period, if the court finds, after notice and opportunity to be heard is afforded to petitioner, the person seeking the withdrawal, and the agency placing a child for adoption, that the withdrawal is in the best interest of the person to be adopted and the court orders the withdrawal.
Since S.O. did not give notice within the 10-day period, the Master had to determine whether withdrawal was in the best interest of J.D.S. The Master concluded that it was not and thus disallowed withdrawal.
S.O. claims that the Master applied an incorrect legal standard in deciding whether to permit withdrawal of her consent under AS 20.15.070(b). She argues that in determining the best interest of the child, a preference in favor of natural parents must be given based on the natural parents' inherent right to the custody of their children. Such a preference, she asserts, is mandated by our decisions in Rita T. v. State, 623 P.2d 344 (Alaska 1981) and Turner v. Pannick, 540 P.2d 1051 (Alaska 1975).
In Rita T., a natural mother's parental rights had been terminated pursuant to AS 47.10.080(c)(3) upon a determination that her daughter was a child in need of aid. After undergoing a fourteen-month rehabilitation program, the natural mother applied for a hearing to review the order terminating her parental rights. We reversed the superior court's denial of a hearing and held
that as long as a child remains the ward of the court, under AS 47.10.080(f) his or her natural parents are entitled to a review of the order terminating their parental rights upon a showing of good cause for the hearing. Good cause could be established if the parents showed that it would be in the best interests of the child to resume living with them because they have sufficiently rehabilitated themselves so that they can provide proper guidance and care for the child.
623 P.2d at 347.
In Turner v. Pannick, a natural mother filed a petition for a writ of habeas corpus to regain custody of her child whom she had given to her sister to care for while she was away. Because the trial court had applied a "best interests" of the child test, we reversed the denial of the mother's petition, holding that in a custody dispute between a parent and a non-parent,
[u]nless the superior court determines that a parent is unfit, has abandoned the child, or that the welfare of the child requires that a non-parent receive custody, the parent must receive custody.
540 P.2d at 1055.
S.O. argues that a rule consistent with these cases should be applied in determining *1005 whether withdrawal of a natural parent's consent to adoption is in the child's best interest. Such a rule, she claims, would require that withdrawal be permitted upon a showing that the natural parent can provide a warm and loving home with an adequate economic and social environment; possible superiority of the adoptive parents would be irrelevant. Had the Master applied this standard, S.O. maintains that the Master would also have found that withdrawal of her consent would have been in the best interest of J.D.S.[11]
The only case which we have found that addresses the precise question before us in a similar statutory setting is Adoption of Jennie L., 111 Cal. App.3d 422, 168 Cal. Rptr. 695 (1980).[12] In that case the natural mother filed a petition to withdraw her consent to her daughter's adoption. The relevant statute provided in part:
If the court finds that withdrawal of the consent to adoption is reasonable in view of all the circumstances, and that withdrawal of the consent will be for the best interests of the child, the court shall approve the withdrawal of the consent. .. .
Cal.Civ.Code § 226a (West 1954). The trial court granted the mother's petition, relying on a statute which prohibited awarding custody to a non-parent absent a finding that an award of custody to the natural parent would be detrimental to the child (see Cal. Civ.Code § 4600(c) (West 1954)); a requirement analogous to that mandated by our decision in Turner v. Pannick, 540 P.2d 1051, 1055 (Alaska 1975).
On appeal, the trial judge's decision was reversed. The court distinguished between a proceeding to withdraw a consent to adoption and one to determine custody, noting that the latter involves the involuntary separation of a parent from his or her child. Adoption of Jennie L., 168 Cal. Rptr. at 699. On the other hand,
where a parent has signed a consent to the adoption of a child by others, the parent may not withdraw such consent unless the court finds that withdrawal is reasonable and in the best interest of the child....
Thus, by consenting to the adoption of a child by others, the consenting parent gives up the parental preference otherwise applicable... .
Id.
We hold that when a natural parent consents to his or her child's adoption and later seeks to withdraw such consent, no parental preference is to be applied in determining what is in the child's best interest.
Since the legislature has enacted statutes prescribing how adoptions shall be accomplished, this court has no power to change in any particular the law as expressed in those statutes... . The role of this court is limited to construing the adoption statutes and attempting to ascertain the meaning of the legislature as expressed therein.
Strobel v. Garrison, 255 Or. 16, 464 P.2d 688, 689-90 (1970), quoted with approval in B.J.B.A. v. M.J.B., 620 P.2d 652, 655 (Alaska 1980). The legislative intent expressed in our withdrawal of consent statute is clear. AS 20.15.070(b) already provides natural parents an absolute right of withdrawal within ten days of giving consent to an adoption. After that period has elapsed, however, the statute ceases to accord natural parents a right superior to that of the *1006 adoptive parents and instead mandates that withdrawal be permitted only if such is in the best interest of the person to be adopted.
Moreover, withdrawal of a consent to adoption differs from situations such as when the state seeks to terminate the parent-child relationship or when a non-parent seeks custody of a child. In those situations, the appropriate inquiry is directed at the natural parent's fitness to parent, since the result may be an involuntary deprivation of "the fundamental natural right of parents to nurture and direct the destiny of their children." Turner v. Pannick, 540 P.2d 1051, 1055 (Alaska 1975) (Dimond, J., concurring). In contrast, a natural parent attempting to withdraw a consent to adoption has already given up that right by voluntarily consenting to the adoption in the first instance, and thus "gives up the parental preference otherwise applicable...." Adoption of Jennie L., 111 Cal. App.3d 422, 168 Cal. Rptr. 695, 699 (1980).
Finally, we are not persuaded by S.O.'s assertion that our holding will reduce the best interest standard to a mere comparison of the economic and social benefits which a natural parent and the adoptive parents can provide.
The "best interests" test is much more than a mere comparison of the social status and economic means of the competing sets of parents... . Rather, the best interests standard involves a careful weighing of the myriad factors, such as the character and maturity of the parents, their commitment to the care of the child, the child's present bonds of affection, the family setting and stability, and so forth, which together form the foundation for a stable and happy home for the child.
In re Anderson, 99 Idaho 805, 589 P.2d 957, 974 (1979) (Bakes, J., dissenting); see also Note, In The Child's Best Interests: Rights of the Natural Parents in Child Placement Proceedings, 51 N.Y.U.L.Rev. 446, 469-70 (1976). We agree with this statement and note also that our role on appeal with respect to this issue is quite limited.
Where the trial judge has guided his decision by reference to the best interest of the child and fully considered all of the evidence before him, there is very little room for the exercise of appellate discretion.
In re Adoption of Cox, 327 So.2d 776, 778 (Fla. 1976). Here, our review of the record satisfies us that the Master reached her decision by reference to J.D.S.'s best interests after fully considering the evidence before her. Accordingly, we find no error in refusing to permit S.O. to withdraw her consent.[13]

*1007 III
S.O.'s final contention is that the lower court erred in awarding the adoptive parents $8,000 in attorney's fees. She maintains that such an award in a case of this nature is not authorized under Civil Rule 82. Because of our disposition of this issue, we need not consider S.O.'s further contention that the award of attorney's fees violates her rights to due process and equal protection under the Alaska and United States Constitutions.
In Adoption of V.M.C., 528 P.2d 788 (Alaska 1974), we discussed the propriety of awarding attorney's fees under Rule 82 in a contested adoption proceeding. That case involved an attempt by paternal grandparents to adopt a child whose father opposed the adoption. The grandparents claimed that the father had abandoned the child and therefore that his consent to the adoption was not required. The lower court found that the father had not abandoned the child and we affirmed. We also upheld the award of costs and attorney's fees to the father, rejecting the grandparents' broad contention that costs and attorney's fees should not be awarded in adoption cases as a matter of judicial policy. Instead, we held that under the circumstances such an award was within the broad discretion of the trial court and that the grandparents had failed to show that the exercise of that discretion had been manifestly unreasonable. Id. at 795-96. In so concluding, we noted the absence of "any sufficiently demonstrable interest or justification" to warrant a departure from the usual procedure under Rule 82. Id. at 796.
We believe that this case, however, is one in which the "equities of the situation," Cooper v. Carlson, 511 P.2d 1305, 1311 (Alaska 1973) make an award of substantial attorney's fees manifestly unreasonable. It is one, to use the language of Cooper, "involving substantial litigable questions in which to require the losing party to pay a sizeable attorney's fee would obviously be unwarranted." Id. at 1311 n. 12. In Crisp v. Kenai Peninsula School District, 587 P.2d 1168 (Alaska 1978), we reversed an award of attorney's fees assessed against a public school teacher whose dismissal from employment was upheld in superior court. Subsequent decisions have made clear that our decision in that case was premised on the importance of the right being asserted; namely, continued employment. Sjong v. State, Dept. of Revenue, 622 P.2d 967, 978-79 (Alaska 1981); Rouse v. Anchorage School District, 613 P.2d 263, 267 (Alaska 1980). We believe that S.O.'s interest in obtaining the return of her child is one equally as deserving of protection from the burden of an award of attorney's fees as that protected in Crisp.
Accordingly, we REVERSE that portion of the lower court's order awarding the adoptive parents costs and attorney's fees. In all other respects, the superior court's order is AFFIRMED.
BURKE, C.J., not participating.
NOTES
[1] See AS 20.15.100(d).
[2] AS 20.15.180(b) provides in relevant part:

All rights of a parent with reference to a child .. . may be relinquished and the relationship of parent and child terminated by a writing, signed by the parent ... (1) in the presence of a representative of an agency taking custody of the child ... or in the presence and with the approval of a court... .
[3] AS 20.15.070(b) provides:

A consent to adoption may be withdrawn before the entry of a decree of adoption, within 10 days, by delivering written notice to the person obtaining the consent, or after the 10-day period, if the court finds, after notice and opportunity to be heard is afforded to petitioner, the person seeking the withdrawal, and the agency placing a child for adoption, that the withdrawal is in the best interest of the person to be adopted and the court orders the withdrawal.
[4] This is regrettable. We urge the trial courts to give priority to contested adoption proceedings, since the child will inevitably form emotional ties to its adoptive parents pending litigation which may make interference with the status quo both more damaging and more difficult than it otherwise would be.
[5] Under certain circumstances a natural mother's consent is not required. See AS 20.15.050. However, none of these circumstances are alleged to be present here.

AS 20.15.040(a)(2) requires a father's consent to the adoption of a minor if the father was married to the mother at the time of conception or thereafter, the minor is his child by adoption, or the father has otherwise legitimated the child. On October 7, 1980 the father of J.D.S. legitimated the child and consented to his adoption by W.S. and P.S. in conformance with AS 20.15.060.
[6] S.O. argues that the document she signed was not intended to be a consent to adoption because it is entitled "Relinquishment of Parental Rights." As noted above, however, the document authorizes Mr. Ross to take all steps necessary toward the adoption of the child and states that S.O. waived her right to withhold her consent to the adoption. From these statements, as well as the circumstances leading up to the execution of the document, we think it abundantly clear that S.O. did in fact intend to consent to her son's adoption. That the document purports to be a relinquishment is not controlling. See In re Roger's Adoption, 47 Wash.2d 207, 286 P.2d 1028, 1030 (1955) (holding a relinquishment of parental rights sufficient to constitute a written consent to adoption under a consent statute).
[7] We recognize that there is authority for strictly construing consent provisions in adoption statutes in favor of the rights of natural parents. See 2 Am.Jur.2d, Adoption, § 7 (1962). We believe, however, that since the paramount purpose of the adoption laws is "to make provision for the welfare of children," Barwin v. Reidy, 62 N.M. 183, 307 P.2d 175, 180 (1957), the better rule is to construe adoption statutes in a manner that will promote this purpose. See In re Barnett's Adoption, 54 Cal.2d 370, 6 Cal. Rptr. 562, 565-566, 354 P.2d 18, 22-23 (1960) (rejecting the rule of strict construction in favor of natural parents). We think that the welfare of children will be better promoted by not permitting mere technical defects in consents to adoption to serve as a basis for disrupting familial ties and relationships that have developed in reliance on the validity of such consents.
[8] S.O. also contends that the adoptive parents' answer to the ninth question on the questionnaire, relating to the adoptive parents' income, was intentionally misleading. According to his testimony, W.S. answered the question by listing what he called "spendable income," which he arrived at by subtracting his income tax liability from gross income. While this figure does not take into account deductions for business expenses, we agree with the Master's conclusion that "[t]he question asked was what his income was and it does not appear reasonable that from the general question asked he should have been required to go into what was used from his actual income as business expense... ." We therefore confine ourselves to whether the adoptive parents' answer to S.O.'s first question was misleading.
[9] S.O. repeatedly asserts that W.S. and P.S. were rejected by Catholic Social Services as adoptive parents. What actually occurred is that when they filed their application to adopt with that agency in June 1978, the social worker assigned to the case insisted that P.S. attend Alcoholics Anonymous meetings and abstain from alcohol completely or they would not be considered by the agency. P.S. felt that this was unreasonable because she disagreed with the philosophy of A.A. and thought that she could still drink socially. This resulted in the adoptive parents' application being placed on "hold" in October 1979. The social worker later assigned to their case when Mr. Ross requested the home study concluded that the agency's earlier stance may have been unnecessarily rigid.
[10] S.O. asserts that there can be no doubt that she would never have consented to her child's adoption by W.S. and P.S. had she known of P.S.'s alcohol history. We can only speculate as to whether this is so. That she sought to withdraw her consent does not by itself lend support to her assertion since she was not aware of the adoptive mother's past alcohol use until after she had filed her withdrawal of consent. Moreover, we are hesitant to accept this assertion as self-evident in light of certain of her own testimony. When questioned about the effect her past history of drug use and drug sales might have on her plan to obtain a license to operate a child day care center, the following exchange took place:

Q. Is it your plan to tell the state and the municipality your entire history? Be completely candid with them?
A. If they ask.
Q. How will they know to ask if you don't say something?
A. If I don't say anything and the fact that I've been off of drugs and alcohol for the past year and a half to 2 years, I don't see it really has much bearing anyway.
Q. So the answer is no if they don't ask.
A. I  I don't think I will volunteer the information, no.
[11] Both the court-ordered report by the Department of Health and Social Services and the court-ordered psychologist's report found S.O. presently capable of parenting a child.
[12] None of the cases cited by S.O. in support of giving a parental preference involve a statutory framework similar to Alaska's. In re Anderson, 99 Idaho 805, 589 P.2d 957 (1979) and Small v. Andrews, 20 Or. App. 6, 530 P.2d 540 (1975) were decided in the absence of a specific statute governing withdrawal of consent and both applied the jurisdiction's judicially created rule that absent grounds for estoppel a consent may be withdrawn at any time prior to the entry of an adoption decree. In re Anonymous, 41 A.D.2d 961, 344 N.Y.S.2d 426 (Sup.Ct.App. Div.), aff'd mem., 33 N.Y.2d 541, 347 N.Y.S.2d 437, 301 N.E.2d 424 (1973) was similarly decided in the absence of a statute in point and has since been legislatively overruled. See N.Y. Domestic Relations Law § 115-b, subd. 2(d)(v) (McKinney 1977).
[13] S.O. claims that the Master erred by considering possible "separation trauma" which J.D.S. might experience should he be returned to her and that this alone is sufficient grounds for reversal. In her report, the Master found that

[a]lthough the natural mother has been given certain visitation rights, it would appear quite probable that the minor would suffer trauma if removed from the petitioner's [sic] home.
According to S.O., this finding was prompted by the guardian ad litem's discussion of "separation trauma" in his report, which he defined as "a scientifically proven reaction of young children to separation from their parent figures." S.O. argues that for the Master to have considered this phenomenon was error because it is based solely on the guardian ad litem's report and because it gives weight to the time during which J.D.S. has been in the adoptive parents' custody while this matter was pending.
With respect to S.O.'s first contention, we note first that there was testimony that J.D.S. was developing psychological attachments to the adoptive parents. Thus, the Master's reference to "trauma" which the child might experience by being returned to S.O. finds support in the record independent of the guardian ad litem's report. Moreover, even if there had been no such testimony, we find no error in the Master's consideration of the guardian ad litem's discussion of "separation trauma." In Veazey v. Veazey, 560 P.2d 382, 387 (Alaska 1977), we noted that it is the guardian ad litem's responsibility to "exercise his best professional judgment on what disposition would further the best interests of the child, his client, and at the hearing vigorously advocate that position before the court." In discussing how this responsibility should be carried out, we quoted with approval a procedural guide for guardians ad litem developed by the bench and bar of another jurisdiction wherein it is stated:
In arriving at his determination, the G.A.L. should utilize all the resources provided by the Court, but he should also avail himself of personal and separate resources. His final recommendation should be based on his own observations combined with the input afforded him from other sources.
Id. at 387 n. 7. Here, the guardian ad litem merely resorted to independent research in discharging what he perceived to be his duty to his client and reported the results of that research to the Master. Finally, we note that S.O.'s own attorney submitted an affidavit to the superior court reporting the results of his research regarding "separation trauma," and thus S.O. was able to respond to the guardian ad litem's discussion of it.
As regards S.O.'s second contention, the alleged error in giving weight to an attachment that may have resulted from the adoptive parents' custody of the child during the hearing, we also perceive no error. The determination under AS 20.15.070(b) is to be made with reference to the best interest of the person being adopted. Present circumstances are certainly relevant in making that determination. B.J.B.A. v. M.J.B., 620 P.2d 652, 656 n. 6 (Alaska 1980).