938 P.2d 1184

**In the Matter of a FEMALE CHILD, born on January 22, 1994, by Jane DOE, the child's natural and legal mother, Petitioner–Appellant.**

**No. 18506.**

Intermediate Court of Appeals of Hawai'i.

April 30, 1997.

Peter Van Name Esser, Honolulu and Marianita Lopez, Saccoccio & Lopez, on the briefs, Haleiwa, for petitioner-appellant.

Mark J. Bennett and Sheryl Cockett (McCorriston Miho Miller Mukai, of counsel), on the brief, Honolulu, for respondents-appellees.

Before BURNS, C.J., and WATANABE and KIRIMITSU, JJ.

BURNS, Chief Judge.

The mother (Mother) of the female child (Child) born on January 22, 1994 appeals the family court's October 18, 1994 Order Denying Petition for Withdrawal of Consent to Adoption and October 18, 1994 Order Denying Motion for Further Hearing or in the Alternative, Motion for Reconsideration. We affirm.

## FACTS

On January 10, 1994, Child's father (Father) and Mother executed an Agreement and Promissory Note with the Law Offices of Judith Jackman for placement of their soon-to-be-born baby for adoption.

On January 19, 1994, Father, and on January 27, 1994, Father and Mother, signed notarized consents (Consents) to the adoption of Child by Respondents (Adoptive Father and Adoptive Mother). Consistent with Hawai'i Revised Statutes (HRS) § 578–2(f) (1993),[1] the Consents stated in relevant part as follows:

> The undersigned further understands ... that after the child has started to reside with the adoptive parent above-named ..., this consent may not be withdrawn or repudiated without the express approval of the judge exercising jurisdiction in adoption proceedings, based upon a written finding, supported by proof to be submitted by the undersigned, that such action will be for the best interest of the said minor child.

On January 28, 1994, Mother wrote and delivered a handwritten note to Judith Jackman stating in relevant part that

> [i]t has not been 24 hours since we have signed the documents to put our baby up for adoption and we have realized that it was a mistake.
>
> * * *
>
> We feel as though we were pressured into giving her up by yourself and the adoptive parents.
>
> We are very sorry, but we just can not give our baby up. We would like to have her back today.

On March 3, 1994, Mother filed her Petition for Withdrawal of Consent to Adoption. When Mother did not appear at the March 10, 1994 hearing and her motion for continuance was denied, her petition was withdrawn without prejudice.

On July 14, 1994, Mother filed a second Petition for Withdrawal of Consent to Adoption (Petition) to withdraw her consent to adoption. After a trial on August 29 and 30, 1994, the court orally denied the Petition. On September 13, 1994, Mother filed a Motion for Further Hearing or in the Alterna-

---

**1.** Hawai'i Revised Statutes (HRS) § 578–2(f) (1993) states in relevant part that a consent to adoption such as the one in this case "may not be withdrawn or repudiated after the individual has been placed for adoption, without the express approval of the court based upon a written finding that such action will be for the best interests of the individual to be adopted."

tive Motion for Reconsideration. On October 18, 1994, the court filed its Order Denying Petition for Withdrawal of Consent to Adoption and its Order Denying Motion for Further Hearing or in the Alternative, Motion for Reconsideration. On October 26, 1994, Mother filed her Notice of Appeal. On December 5, 1994, the court filed its (1) Order Denying Petition for Withdrawal of Consent to Adoption and (2) Findings of Fact and Conclusions of Law. The latter states in relevant part as follows:

### FINDINGS OF FACT

1. On January 10, 1994, [Mother] and [Father], birth parents executed an Agreement and Promissory note with the Law Offices of Judith Jackman for placement of their baby for adoption. [Father] and [Mother] resided in London, England at the time of the execution of the contract.

2. The Agreement required the adoptive parents to make the following payments: (a) two round trip London[-]Hawaii [Hawai'i] airfares, (b) babysitting fees, (c) two thousand dollars for housing, food and transportation expenses, (d) Five thousand five hundred and eleven dollars for three months lost earnings for [Mother], (e) all medical and legal expenses for [Mother], the baby and the adoption.

3. On January 10, 1994, [Adoptive Mother] and her husband [Adoptive Father] executed a contract regarding adoption for adoption of an infant to be born on or about January 31, 1994.

4. On January 10, 1994, [Adoptive Father] paid [Father and Mother] $2,835.20 for nanny expenses for the care of [Father's and Mother's] minor child, [Older Daughter]. The evidence contradicts [Mother's] testimony that Judith Jackman told her to lie about having a nanny expense. The evidence clearly showed (and [Mother] admitted) that she lied to [Adoptive Mother], [Adoptive Father], and [lawyer] Ms. [Laurie] Loomis that she had a nanny service for her [Older Daughter].

* * *

8. [Father] and [Mother] arrived in Honolulu on Sunday January 16, 1994.

9. On January 19, 1994, a meeting was held at Judith Jackman's office. [Father, Mother, Adoptive Mother and Adoptive Father] were present. Earlier that day, [Father] signed the consent for adoption. The evidence offered by [Adoptive Mother and Adoptive Father] showed that [Mother] was aware that she could not sign the consent until 72 hours following the birth of the baby.

* * *

11. On [January 22], 1994, [Child] was born following complications during delivery. . . .

12. On January 23, 1994 [Father and Mother] notified Donna Tsutsumi–Ota, MSW Kapiolani Straub, that they did not want to place the baby for adoption with [Adoptive Mother and Adoptive Father] because of their age, 50 years. [Father and Mother] had, prior to the delivery, notified [lawyer] Judith Jackman that they did not want [Adoptive Mother and Adoptive Father] as adoptive parents because of their age.

13. On January 23, 1994 [Father] and [Mother] left the hospital without the baby.

* * *

15. The social worker advised [Father and Mother] that they needed to make arrangements to place the baby for adoption or to take the baby home with them by 9:00 the following morning or Kapiolani Hospital staff would call Child Protective Services.

16. On January 25, 1994, [Father] and [Mother] arrived at Kapiolani Hospital and the baby was discharged to their care. . . .

17. [Mother] signed a Promissory Note assuming financial responsibility for the medical expenses before leaving the hospital. [Father] refused to sign the Promissory Note despite the hospital's policy to the contrary.

18. On January 25, 1994, after leaving the hospital, [Father] and [Mother] met with Laurie Loomis for over three hours regarding placing the baby for adoption with one of Ms. Loomis' clients.

19. Ms. Loomis spent a great deal of time explaining Hawaii [Hawai'i] adoption law specifically explaining that the consents, once signed, could not be withdrawn unless there was evidence of fraud, duress or undue influence. After [Father] and [Mother] were fully informed of their rights, they assured Ms. Loomis that they wanted to proceed with finding another couple to adopt their baby.

20. During this meeting [Father] [sic] informed Ms. Loomis that she wanted the prospective adoptive parents to be responsible for the following expenditures: car and petrol ($2,100.00), hotels ($600.00), apartment ($800.00), food ($480.00), maternity clothes ($300.00), nanny expenses ($1,632.80), airfare ($2,669.00), hospital ($4,867.45), loss of earnings ($5,768.24), misc. ($300.00) totalling $19,617.49. These amounts were reflected in the handwritten list which [Mother] gave to Ms. Loomis.

21. [Mother] told Laurie Loomis that she had paid for the hospital bill in full and needed to be reimbursed by the prospective adoptive family. The evidence indicated that [Mother] had signed a Promissory Note and that Kapiolani Hospital had not been paid in direct contradiction to [Mother's] statements to Ms. Loomis that she needed to be paid directly for out of pocket hospital expenses.

22. The evidence showed that Judith Jackman gave [Father and Mother] $1,300.00 to rent a car for one month, but that [Mother and Father] did not pay for the automobile they rented through Alamo. [Mother] admitted in her testimony, that there was a warrant out for the repossession of the car for their failure to pay and she further admitted to lying to the Alamo representative.

23. The evidence showed that [Father and Mother] continued to assert their desire to place the baby for adoption and that they even met with one of Ms. Loomis' adoptive parents.

24. On January 26, 1994, after [Mother] had taken the baby home from the hospital, had told [Adoptive Mother and Adoptive Father] that the adoption was off, and after being informed of Hawaii [Hawai'i] adoption law by Ms. Loomis, the court finds from credible evidence that [Father and Mother] reinitiated discussions with [Adoptive Mother and Adoptive Father] regarding the adoption by telephoning [Adoptive Mother and Adoptive Father] and inviting them to their home. The court again finds from credible evidence that [Mother] lied to the court when she testified, and through her affidavit, that [Adoptive Mother and Adoptive Father] had arrived at [Mother's and Father's temporary] home uninvited. The [Adoptive Mother and Adoptive Father] were *withdrawing* rather than asserting influence over the [Father and Mother].

25. The court further finds that on January 27, 1994, [Father and Mother], with the full complicity and cooperation of each other, voluntarily signed the consents for adoption and caused more money to be obtained from [Adoptive Mother and Adoptive Father] for lost wages.

26. The court further finds (and [Mother] admitted in her testimony) that she lied to Judith Jackman, [Adoptive Mother], [Adoptive Father] and Laurie Loomis about having a job.

27. The court finds that less than 24 hours after receiving a cashiers check in the amount of $5,511.06 for lost wages and obtaining [Adoptive Father's] signature on the Promissory Note for the Kapiolani Hospital bill, [Father and Mother] notified Judith Jackman that they had changed their mind regarding the adoption.

28. The Court finds that Dr. Acklin based his testing on [Mother's] mental state during the execution of her consent on the same dishonest statements this Court has heard, and thus does not find his testimony convincing as to her lack of volitions.

### CONCLUSIONS OF LAW
* * *

3. The material allegations of the Petition for Withdrawal of Consent for Adoption were not met by clear and convincing evidence.

4. The issues before the court were whether the consent for adoption was in-

valid because the consent was obtained by fraud, undue influence or duress. The second issue before the court was whether the consent should be withdrawn because it is in the best interest of the child.

5. The court concluded that [Mother] was not a credible witness. The court discounted [Mother's] prior inconsistent testimony and past lies on the basis it could have been attributed to influence by her husband [Father]. The court concluded, however, [Mother] has not been truthful in court and in her affidavit. The court did not believe [Mother's] evidence based on the contradictory testimony of disinterested witnesses.

6. The court has concluded that Judith Jackman did not exert undue influence.

7. The court has concluded that there was absolutely no evidence that either [Adoptive Mother or Adoptive Father] exercised undue influence.

\* \* \*

9. The court has concluded by clear and convincing evidence that [Mother's] will was not overpowered and that there was no duress exerted by [Father].

10. The court has therefore concluded that there was no fraud, duress or undue influence and that the consent is valid.

11. The court concludes that the promptness of [Father's and Mother's] notification to withdraw their consent does not affect the best interests determination once a valid consent has been established.

12. The court has concluded that [Mother's] consent should not be withdrawn on the basis of best interests of the child. The court has concluded that no parental preference should be applied once

there has been consent. [*S.O. v. W.S.,*] Alaska, 643 P.2d 997 (1982).

13. The court considered the following factors in determining whether the consent should be withdrawn on the basis of best interests of the minor child: character, maturity of parents, commitment to care of child, child's present bonds of affection, family setting, family stability, stability of mother and work situation of two parents.

14. Weighing all of the preceding factors, the court has concluded that it is in the best interest of the child that the consent to adoption not be revoked.

(Emphasis in original.)

## DISCUSSION

### 1.

■ Mother challenges the second sentence of Conclusion of Law (COL) No. 12. She contends that the court reversibly erred when it refused to consider blood ties when it determined whether Mother's withdrawal of consent was in the best interests of Child under HRS § 578–2. In her view, determination of "best interests" under HRS § 578–2(f) requires the court's consideration of the parental priority provisions of HRS §§ 571–46(1) (1993)[2] and 587–1 (1993).[3] We disagree.

In Alaska, a statute

already provides natural parents an absolute right of withdrawal within ten days of giving consent to an adoption. After that period has elapsed, however, the statute ceases to accord natural parents a right superior to that of the adoptive parents and instead mandates that withdrawal be permitted only if such is in the best interest of the person to be adopted.

> The policy and purpose of this chapter is to provide children with prompt and ample protection from the harms detailed herein, with an opportunity for timely reconciliation with their families where practicable.... In making each determination, all involved should consider the fact that the child's best interests may well be forever intertwined with those of the child's birth family, even where the legal custodian is determined to be either unwilling or unable to provide the child with a safe family home.

2. HRS § 571–46 (1993) states in relevant part that "[i]n the actions for divorce, separation, annulment, separate maintenance, or any other proceeding where there is at issue a dispute as to the custody of a minor child, ..., the court shall be guided by the following standards, considerations, and procedures: (1) Custody should be awarded to either parent or to both parents according to the best interests of the child[.]"

3. HRS § 587–1 (1993) is Hawai'i's Child Protective Act. It states in relevant part as follows:

Moreover, withdrawal of a consent to adoption differs from situations such as when the state seeks to terminate the parent-child relationship or when a nonparent seeks custody of a child. In those situations, the appropriate inquiry is directed at the natural parent's fitness to parent.... In contrast, a natural parent attempting to withdraw a consent to adoption has already given up that right by voluntarily consenting to the adoption in the first instance, and thus "gives up the parental preference otherwise applicable[.]" *Adoption of Jennie L.*, 111 Cal.App.3d 422, 168 Cal.Rptr. 695, 699 (1980).

*S.O. v. W.S.*, 643 P.2d 997, 1005–06 (Alaska 1982).

The only difference between Hawai'i and Alaska is that Hawai'i does not have a ten-day withdrawal period. In other words, in Hawai'i, the *S.O. v. W.S.* rule applies immediately after the requirements of HRS § 578–2(f) have been satisfied. Thereafter, the issue is not custody. The issue is whether the court's allowance of the withdrawal of the consent to adoption will be for Child's best interests.[4] On that issue, HRS §§ 571–46(1) and 587–1 do not apply.

Mother contends that

[t]he court's ruling placed Mother on the horns of a dilemma.... To establish duress and/or undue influence she had to show immaturity and participation in a pathological relationship. This same evidence made her appear less qualified than Adoptive Parents to raise [Child] under the "best interests" standard of [HRS § 578–2(f)].

We agree. However, the court's ruling was based upon the law.

### 2.

◼ Mother challenges CsOL Nos. 11 and 13 and contends that the court reversibly erred when it (1) refused to consider the promptness of Mother's withdrawal of consent and (2) considered the emotional involvement of Adoptive Mother and Adoptive Father and Child's "present bonds of affec-

tion[.]" In essence, she contends that had her prompt withdrawal of consent been timely granted and Child returned to her, the emotional involvement of Adoptive Mother and Adoptive Father and Child's bonds of affection to them would have been minimal.

Leaving open the possibility that the non-prompt notification of withdrawal of consent may be a negative factor when determining Child's best interests, we agree with the family court that prompt notification is not a positive factor.

We agree with the family court that the "child's present bonds of affection" is a relevant factor.

### 3.

◼ Mother contends that lawyer Laurie Loomis (Loomis) should not have been allowed to testify because (1) Loomis' testimony showed she advised Mother on adoption and entered into an attorney/client relationship during a January 9, 1994 telephone call and a January 26, 1994 visit and the court should have conducted an inquiry into the attorney/client privilege, *Sapp v. Wong*, 62 Haw. 34, 38, 609 P.2d 137, 140 (1980); and (2) the fact that Loomis testified in an earlier hearing over objection by prior counsel was not a waiver.

We conclude that this point is without merit. The evidence is clear that Loomis represented prospective adoptive parents and did not enter into an attorney/client relationship with Mother. Moreover, Mother had testified before the objection to Loomis' testimony was made and before Loomis had testified. We agree with Adoptive Mother and Adoptive Father that, pursuant to Hawai'i Rules of Evidence Rule 511, Mother waived her alleged privilege when she testified to a significant part of the allegedly privileged matter.

### 4.

◼ On August 3, 1994, the family court judge restricted the parties to a two-day

---

**4.** According to HRS § 571–46(5) (1993), "best interests" means "best physical, mental, moral, and spiritual well-being[.]"

trial, one day for each side. There was no objection. Mother contends that it was a denial of her right to due process to allow Mother just one day of testimony to show that withdrawal of consent was in the best interests of Child. We disagree. Mother does not assert that she was denied an opportunity to introduce relevant evidence. Her opponents ended their presentation of evidence before the end of the second day. Mother then was permitted to call other witnesses and she did. Before the conclusion of the day, Mother's counsel was asked if she had any more witnesses. Her response was, "Nothing else, Your Honor."

### 5.

 COL No. 3 states that "[t]he material allegations of the Petition for Withdrawal of Consent for Adoption were not met by clear and convincing evidence." Mother contends that the court erroneously imposed on Mother the burden to show best interests by clear and convincing evidence. We disagree. Although the court's findings of fact and conclusions of law are not as clear on this question as they might be, we conclude that with respect to the two issues noted in COL No. 4, the court properly applied the clear and convincing standard only to the first issue, namely, whether the consent for adoption was invalid because the consent was obtained by fraud, undue influence, or duress.

Mother contends that because the issue was the severance of the parent-child relationship, the burden was on those who opposed her petition to disprove Mother's petition by clear and convincing evidence. We disagree with Mother. As noted in COL No. 4, there were two issues. When Mother failed her burden of proving by clear and convincing evidence that her consent was obtained by fraud, undue influence, or duress, her consent remained valid. Mother's valid consent severed the parent-child relationship. Mother's attempted withdrawal of her valid consent generated the resulting question whether "such action will be for the best interests of the individual to be adopted." HRS § 578-2(f). On that issue, Mother had the more probable than not burden of proof.

## CONCLUSION

Accordingly, we affirm the family court's October 18, 1994 Order Denying Petition for Withdrawal of Consent to Adoption and October 18, 1994 Order Denying Motion for Further Hearing or in the Alternative, Motion for Reconsideration.