723 P.2d 829

**In the Matter of the Petition of STEVE B.D. and Linda Sue D., Adopting Parents.**

**Mary Ann DeBERNARDI, Petitioner-Appellant,**

v.

**STEVE B.D. and Linda Sue D., Respondents.**

No. 15998.

Supreme Court of Idaho.

June 17, 1986.

Rehearing Denied Aug. 29, 1986.

Roderick Dale Gere, Eagle, for petitioner-appellant.

Scott Eugene Fouser, Nampa, for respondents.

SHEPARD, Justice.

This is an appeal from an order of the district court which affirmed an order of the magistrate court, which denied a petition to revoke consent to the adoption of a child. We *affirm.*

Appellant Mary Ann DeBernardi gave birth to a child on March 5, 1984. On

March 7, 1984, before a magistrate, DeBernardi executed a consent to the adoption of that newborn child by Mr. and Mrs. D. Mr. and Mrs. D. filed a petition for adoption of the child on March 9, 1984. DeBernardi filed a written revocation of her consent to the adoption of the child on March 20, 1984. A hearing was held on the attempted revocation of consent in May of 1984 before a magistrate who denied the attempted revocation. That order of the magistrate was appealed to the district court which affirmed the order of the magistrate in March of 1985. The appeal before this Court was heard in January 1986. In the interim there have been no further adoption proceedings and no decree of adoption. The child has lived with Mr. and Mrs. D. since March 7, 1984.

In 1982 DeBernardi, a 36-year-old woman who had four children, was recently divorced after a long marriage, and had minimal financial resources. She responded to a newspaper advertisement which sought surrogate mothers. She consulted with attorney Bert Osborn who had placed the advertisement. He informed her that prospective adoptive parents were willing to pay her $7,000.00 plus her medical and legal expenses to be a surrogate mother. Negotiations for such surrogate parenthood were never completed.

Sometime later DeBernardi met and sporatically began living with one Chet Swan during 1982 and 1983. In July 1983 DeBernardi learned she was pregnant, allegedly by Swan. Swan left DeBernardi in September 1983. Thereupon DeBernardi recontacted Osborn to inform him of her pregnancy and of her desire to have the child placed for adoption. Osborn advised DeBernardi to hire another attorney, and she then sought advice from McDonald, an attorney who had previously handled her divorce.

On September 15, 1983 a written contract was executed between DeBernardi and Mr. and Mrs. D. in which DeBernardi agreed to give up her as yet unborn child for adoption, and Mr. and Mrs. D. agreed to adopt the child when born. The contract provided for the payment of DeBernardi's legal and medical costs, but did not provide for any payment to be made to DeBernardi herself. The contract provided for the payment of costs of artificial insemination, and was generally in the format of a surrogate mother contract. Evidently that format was utilized because the contract provided that the prospective adoptive parents could not refuse to accept the child if it were born with a defect or if there were multiple births. The contract further provided that the parties were not to meet each other nor to know each other's names.

Prior to, and again after the execution of the contract, DeBernardi met with and discussed the proposed adoption with Davenport, a counselor with the Department of Health and Welfare. In December 1983 attorney Osborn withdrew from the proceedings and referred the prospective adoptive parents to attorney McDonald who in turn referred them to attorney Fouser.

DeBernardi gave birth to a child at 2:00 a.m., March 5, 1984. During the time that she was in the hospital she twice consulted with Bev Putnam, director of social services for the hospital. Putnam testified that she spent over an hour reviewing the question of adoption, and the alternatives thereto, with DeBernardi. The child was delivered to Mr. and Mrs. D. who took the child home on March 7, 1984.

On March 7, 1984 DeBernardi appeared before Magistrate Birnbaum to execute a consent to the adoption of the newborn child by Mr. and Mrs. D. and to terminate her parental rights. At that time she testified under oath that she did not know the identity of the child's father, and that she had contemplated the adoption for nine months. She testified that no one had threatened or coerced her into giving her consent. DeBernardi then executed the consent document before the magistrate.

On March 17, 1984, the current counsel for DeBernardi notified Mr. and Mrs. D. that DeBernardi had revoked her consent, and on March 20, 1984 DeBernardi filed with the court a written revocation of consent. A hearing on DeBernardi's petition

to revoke her consent and dismiss the adoption petition of Mr. and Mrs. D. was held on May 11, 1984, before Magistrate Drescher. Swan made a motion to intervene in the adoption proceeding and sought custody of the child. Swan was permitted to intervene, but it was held that Swan's consent to the petition for adoption was unnecessary and Swan's request for custody was denied. Swan has filed a separate appeal but is not a party to this appeal.

At the conclusion of the hearing, Magistrate Drescher denied DeBernardi's attempted revocation and her petition to dismiss the adoption petition. That decision of the magistrate was appealed to the district court, which affirmed the magistrate.

Magistrate Drescher rendered his decision denying DeBernardi's attempted revocation of her consent and denying her petition to dismiss the adoption proceedings on the basis of what he perceived to be the standards of *Matter of Andersen,* 99 Idaho 805, 589 P.2d 957 (1978). Magistrate Drescher therefore held that DeBernardi was estopped from revoking her consent to the adoption.

In *Andersen,* a young unwed mother decided to privately place her child for adoption, and she chose the Crapos as the adoptive parents. As she went into labor she changed her mind and informed the Crapos that the baby would not be adopted. Shortly after the birth of the child the mother married the father of the child. A month later she called the Crapos to inform them that they could adopt the child. The Crapos and the Andersens met, and the baby was delivered to the Crapos. The parties signed an adoption form and had their signatures notarized at a bank. The Andersens went to California and twice called the Crapos requesting the return of the child. During a third telephone call the Andersens apologized for the demands for the return of the child, and indicated they would not attempt to regain custody. An adoption proceeding was initiated by the Crapos and a decree of adoption was issued. Approximately two months later the Andersens again demanded the return of

the child, and when met with a refusal filed a petition for writ of habeas corpus. After a hearing before the district court the adoption decree was set aside and the child ordered returned to the Andersens.

The adopting parents appealed to this Court, and the district court order was affirmed. A majority of this Court held that a natural parent should be permitted to revoke a valid consent to adoption unless estopped from doing so. The Andersens were held not to be estopped from revoking their otherwise valid consent. The Court held that the following factors were to be considered in determining whether or not natural parents should be estopped to revoke their otherwise valid consent to adoption:

"the circumstances under which the consent was given; the length of time elapsing, and the conduct of the parties, between the giving of consent and the attempted withdrawal; whether or not the withdrawal was made before or after the institution of adoption proceedings; the nature of the natural parent's conduct with respect to the child both before and after consenting to its adoption; and the 'vested rights' of the proposed adoptive parents with respect to the child." *Id.* at 811, 589 P.2d at 963.

As above noted, Magistrate Drescher held that DeBernardi was *estopped to revoke* her consent, and DeBernardi asserts that the magistrate failed to give adequate consideration to the fact that there was prompt revocation of consent (within ten days), and the circumstances surrounding her giving of consent.

At the hearing before Magistrate Drescher, DeBernardi testified that she had received no counseling prior to the birth of the baby, and that at the time she entered the hospital she had decided not to go through with the adoption. She indicated that she had purchased various furniture and clothes in anticipation of bringing the baby home. She further testified that attorney McDonald had told her to state at the hearing before Magistrate Birnbaum that she did not know who the father was.

She also testified that in February she decided to make her consent to adoption conditional upon agreement that the child would be raised out-of-state, that it would be reared in the Catholic faith, and that the adoptive parents would be childless. She further testified that attorney McDonald had exerted influence upon her to give the child up for adoption.

On the other hand, McDonald testified at the hearing that he had reviewed the consent form with DeBernardi and discussed its legal ramifications, and denied that DeBernardi ever attached any conditions to the adoption. He testified that DeBernardi had never expressed any desire to take her child home with her from the hospital, and that one of the continuing concerns of DeBernardi was the fact that she worked a night shift. McDonald denied that he had ever coached DeBernardi to testify that the father was unknown at the hearing before Magistrate Birnbaum, and testified that DeBernardi gave conflicting versions of the paternity of the child.

Although DeBernardi testified that while she was in the hospital she told the director of social services that she was being pressured to consent to the adoption, Putnam, the director of social services at the hospital, testified that she counseled with DeBernardi at least twice, and that DeBernardi appeared to be firm in her decision to consent to adoption and give up the child.

Mr. and Mrs. D both testified at the hearing. Both testified that they have had uninterrupted custody of the child since March 7, 1984, and that they love the child and consider him a part of the family. Mrs. D testified that adoption had been contemplated since July 1983, and that she and her husband had paid DeBernardi's legal fees in the amount of $2,000.00 to McDonald, and $2,500.00 for DeBernardi's medical expenses.

Upon appeal to the district court that court stated:

"While the Magistrate did not enter a document literally entitled Findings of Fact and Conclusions of Law, and while the Memorandum and Order, to a considerable extent, simply recites the conflicting testimony of key witnesses without specifically stating that one witness's testimony was given greater credence by the Court than that of another witness, this Court concludes that it is abundantly clear from a reading of the entire Memorandum and Order what facts the Magistrate accepted and what law he acted upon. Furthermore, this Court finds that the Memorandum and Order is well supported by the testimony appearing in the transcript.

"... The trial Court's ultimate finding that the appellant simply changed her mind is well supported, and the decision of Judge Drescher is affirmed by this Court."

Magistrate Drescher reviewed the five factors set out in *Andersen* to be considered by a court in passing upon a revocation of consent to adoption. Magistrate Drescher contrasted the mature woman in the instant case, and the distress of a young woman without any advice, as in *Andersen*. He indicated that DeBernardi was a mature woman who "had the benefit of counsel throughout the period of pregnancy and for a material period of time before; she had reviewed the matter on a number of occasions with her attorney and also discussed and reviewed the pros and cons of the adoption versus other alternatives. She also had the benefit of consultation with a social worker during the term of her pregnancy...." Magistrate Drescher contrasted DeBernardi's situation with that of the natural mother in *Andersen* who attempted to care for the child for some considerable period of time in the home of her parents. In the instant case DeBernardi had very brief contact with the child at the hospital. The magistrate indicated that Mr. and Mrs. D. had uninterrupted custody of the child since March 1984, that they have renamed the child, that they had expended considerable sums in regard to medical attention as well as legal fees. The magistrate found that the above factors, together with the emotional attachment to the child, required a holding that

DeBernardi was estopped from revoking her consent. Additionally, the magistrate court noted that there was "not the slightest bit of evidence that the consent was induced by fraud or duress" and that in contrast to the Andersen proceeding DeBernardi had a full judicial proceeding in the securing of her execution of consent and "Mrs. DeBernardi in fact executed the consent freely, voluntarily, intelligently, knowingly and with full knowledge of its consequence."

■ We hold, therefore, that under the standards enunciated in *Andersen,* that the magistrate court as affirmed by the district court, was correct in its holding that DeBernardi was estopped to revoke her consent to the adoption, and in denying DeBernardi's petition to dismiss the adoption proceedings brought by Mr. and Mrs. D. Although we have held that the trial court was correct in its decision that the facts in the instant case satisfied the estoppel requirements as set forth in *Andersen, supra,* we today overrule *Andersen* and its "estoppel" approach to an attempted revocation of a consent to adoption.

■ The central issue in *Andersen,* as in the case at bar, is whether in the absence of fraud, duress or undue influence a natural parent who has executed a consent to adoption has the right for an indeterminate period to simply change his or her mind and revoke consent as in *Andersen,* even after an adoption procedure has been completed. We now hold that in the absence of fraud, duress, or undue influence, consents to adoption become final and irrevocable upon execution of the consent to adoption by the natural parents, and delivery and surrender of the child to the adoptive parents. We so hold in the view of thus promoting the child's welfare and subordinate to that welfare the protection of the interests of the natural and the adoptive parents. *See, Department of Social Welfare v. Superior Court,* 459 P.2d 897 (Cal. 1969); *Stjernholm v. Mazaheri,* 506 P.2d 155 (Colo.1973). *See also, In re Adoption of Randolph,* 227 N.W.2d 634 (Wis.1975); *Mawhinney v. Mawhinney,* 66 Wis.2d 679, 225 N.W.2d 501 (1975).

It was well stated that the estoppel approach of *Andersen* inevitably will breed litigation and uncertainty with the future of potentially adoptive children remaining in a state of limbo for years.

"Uncertainty, as this case verifies, breeds litigation which, regardless of how the issues are ultimately decided by the courts, often results in tragedy for the child.... Much of this could be avoided by a clear, decisive and easily ascertainable standard for determining, short of prolonged litigation, when and if a consent is revocable. In this respect the majority opinion fails egregiously. The standard adopted by the majority, estoppel, does not provide the public with any clear guidelines. It is a standard only the courts can apply. Under that standard, questions concerning revocation cannot be resolved with any certainty without litigation." *Andersen,* 99 Idaho at 818–819, 589 P.2d at 970–971 (Bakes, J., dissenting).

We perceive the majority opinion in *Andersen* as focusing unduly on the rights of and consideration for the interests of the natural parents to the exclusion of the welfare of the child. Although this Court has long recognized the right of natural parents to the care and custody of their own children, case law pre-*Andersen* does not establish any rule primarily favoring the rights of natural parents in a case such as presented here. As well pointed out by the dissenting opinion of Bakes, J., in *Andersen,* where the child has been delivered to and has been for some period of time in the custody of the prospective adoptive parents, emotional ties and bonds are established between the child and the adoptive parents, the severance of which will be as traumatic, if not more so, than the severance of the ties between the child and the natural parents.

As stated in the dissenting opinion of Bakes, J., in *Andersen:*

"However, the natural parents actually have the least interest in the specific point at which a consent becomes irrev-

ocable, though they certainly have a strong interest in knowing when it is. Unlike the child and the adoptive parents, the natural parents have complete control over when the consent is given. There is no deadline for the natural parents. They can surrender the child and consent to the adoption at any time which best fits their needs and interests. That most natural parents choose to give the child for adoption at birth recognizes the sociological fact that the longer the decision for adoption is delayed the more difficult it is to sever the emotional bonds between the mother and the child. But the decision is solely the natural parents' to make, and in the absence of fraud, coercion, or undue influence they should be bound by it, because after the consent is given and the child placed with the adoptive parents, the same emotional bonds are forged with the new parents. By changing her mind the natural mother is not merely exercising what the majority apparently finds to be the natural right of an 'extremely distraught, concerned and upset' woman, but is destroying the emotional bonds which the child has forged with its new parents and, in most cases, the only parents and family it has ever known.

. . . .

"Nevertheless, I do believe the fact that the natural mother, subsequent to consenting to the adoption, has had a change of heart and now is desirous and willing to care for the child may be significant in the adoption proceedings. I.C. § 16–1507 requires that before entering a final order of adoption the judge must be 'satisfied that the interests of the child will be promoted by the adoption.' Certainly the natural parents' desire to regain custody of the child and their present willingness to assume the parental responsibility for the child are relevant to the judge's determination whether the proposed adoption is in the child's best interests. If convinced that the best interests of the child would be promoted by returning the child to the natural parents, the judge, in my view, would be entitled under I.C. § 16–1507 to deny the adoption petition and order the child returned to the natural parents. However, such decision must be based upon careful findings that such action would in fact serve the child's best interests and not merely upon the fact that the natural parents have changed their minds. This interpretation of Idaho's adoption act best ensures that its primary purpose, the promotion of the welfare of children, will be served. It also conforms to the principles embodied in the Uniform Adoption Act prepared by the National Conference of Commissioners on Uniform State Laws." 99 Idaho 805 at 820–822 [589 P.2d 957].

We hold that while natural parental ties are one factor to be considered in determining the best interests of the child, such ties are not to be treated as a presumption in favor of the natural parents. When, in the absence of fraud, duress, or undue influence a consent to adoption has been executed and the child has been delivered to the potential adopting parents, the general rule favoring natural parents is inoperative and rather a judicial inquiry is triggered into the best interest of the child. *See Matter of Adoption of R.P.R.*, 98 Wis.2d 613, 297 N.W.2d 833 (1980). The best interest of the child test is much more than a mere comparison of the social status and economic means of the competing sets of parents, and our courts are well equipped to make inquiry into the child's best interest, going well beyond a balance sheet financial comparison. As indicated in *S.O. v. W.S.*, 643 P.2d 997 (Alaska 1982), the best interest of the child standard is not a mere comparison of the economic and social benefits which competing sets of parents can provide. The Alaska court in its holding, quoted extensively from the dissenting opinion of Bakes, J., in *Andersen.*

In brief, we adopt the philosophy enunciated by Bakes, J., in his dissenting opinion in *Andersen.*

We further note, as did the *Andersen* majority, that case law from other jurisdictions must be studied critically as it is impossible to find another case in which

both the circumstances of the parties and the statutory framework of the jurisdictions are identical. One factor, however, appears to remain constant in all cases. When the natural mother changes her mind and litigation is instituted, there will be a considerable passage of time before there is any resolution. In the instant case the custody of the child has been in the adoptive parents for more than two years, with the strong ties and emotional attachments which inevitably form.

Finally, we examine DeBernardi's assertion that her attorney-client relationship with attorney McDonald was tainted because McDonald's fees were paid by Mr. and Mrs. D. Our Disciplinary Rule 5–107 provides:

"A. *Except with the consent of his client after full disclosure,* a lawyer shall not:

1. Accept compensation for his legal services from one other than his client.

2. Accept from one other than his client anything of value related to his representation of or his employment by his client.

"B. A lawyer shall not permit a person who recommends, employs, or pays him to render legal services for another to direct or regulate his professional judgment in rendering such legal services." (Emphasis added.)

■ In the instant case the record clearly indicates that DeBernardi, in the written agreement, not only consented to the payment of her legal fees by Mr. and Mrs. D., but undoubtedly insisted upon it, since at that time she was in severe financial straits. While such an arrangement is less than ideal, under such circumstances and absent an offer of *pro bono* assistance, there appears no other practical method by which DeBernardi, nor most natural mothers giving up a child for adoption, could obtain legal advice. Further, there is no evidence in the record, and we see no inference, that McDonald allowed Mr. and Mrs. D. to regulate his professional judgment in rendering services to Mrs. DeBernardi.

Magistrate Drescher reviewed not only the transcript, but also the taped recording of the hearing before Magistrate Birnbaum, at which time DeBernardi executed the consent to adoption. Magistrate Drescher found, "The hearing [before Magistrate Birnbaum] was most thorough in nature. Although it does not appear from the naked transcript, the ambiance upon listening to the recorded record is one of a relaxed, unhurried and deliberate inquiry. DeBernardi did not testify that her relinquishment of parental rights was conditional." As herein noted, Magistrate Drescher indicated there was "not the slightest bit of evidence that the consent was induced by fraud or duress," and "Mrs. Debernardi in fact executed the consent freely, voluntarily, intelligently, knowingly and with full knowledge of its consequence." Hence the record demonstrates clearly the absence of fraud, duress or undue influence necessary under our standard enunciated today of factors justifying the revocation of consent.

■ Although DeBernardi argues that Magistrate Drescher's order must be reversed because his written memorandum opinion does not expressly state it constitutes findings of fact and conclusions of law, we agree with and affirm the district court who noted: "This court concludes that it is abundantly clear from a reading of the entire memorandum and order what facts the magistrate accepted and what law he acted upon." The decision of Magistrate Drescher permits meaningful appellate review, and while perhaps technically violative of I.R.C.P. 52(a), such does not require a remand in this case. *Accord Matter of Adoption of Baby Girl Chance,* 4 Kan.App. 576, 609 P.2d 232 (1980).

While we have overruled *Andersen* insofar as it enunciates the estoppel standard in evaluating an attempted revocation of consent to adoption, we reiterate the holding of *Andersen* as it pertains to the execution of consents to adoption before a judicial officer.

All parties to the instant action have endured a lengthy and undoubtedly painful

litigation which has perhaps best demonstrated the unworkability and unfairness of the "estoppel" rule enunciated by the majority in *Andersen,* and lends even greater credence to the Bakes, J. dissent in *Andersen.* Under the rule of today's case the decision of the district court affirming the orders of the magistrate is affirmed. Costs to respondents.

DONALDSON, C.J., and BAKES and HUNTLEY, JJ., concur.

BISTLINE, Justice, concurring in part and dissenting in part.

## I.

I concur in the Court's judgment to affirm the trial court decision, but am unable to concur in an opinion which contains the uninvited and unnecessary overruling of *In re Andersen,* 99 Idaho 805, 589 P.2d 957 (1978), which most practitioners will see as a wholly vindictive response by the *Andersen* dissenters to having not commanded a majority. As far as the litigants here are concerned, neither voiced any challenge to the validity of *Andersen,* and respondents—whom the majority agrees with today—*relied upon it to support their position.*[1] We have heard no argument doubting *Andersen's* validity, nor has any court in any other jurisdiction criticized it. In short, the first time *Andersen* was called into question is by those who, some knowingly and some, perhaps, unknowingly, denigrate and overrule it by today's opinion for the Court.

A careful review of the decision of Judge Drescher further will convince anyone of the inappropriateness of the majority's action today. In an exhaustive and well-written opinion, Judge Drescher *applied* the ruling of *Andersen* in denying DeBernardi's attempt to revoke her consent to the adoption. I append Judge Drescher's opinion as Attachment I for reference.

My concern with the propriety of today's action is further heightened by the fact that the author of today's opinion was one of the *Andersen* dissenters. Today's case should not be used merely as a vehicle by which to vindicate views expressed eight years ago. In the eight years since it was released, *Andersen* does not appear to have been assailed or criticized as being unreasonable, unworkable, or unfair. In fact, quite the contrary. Judge Drescher's application of it here is further proof of that.

Far worse, however, than the gratuitous overruling of a case which has guided the lower courts for these past eight years is the four months of judicial delay which the majority has taken to formulate its overruling *ratio decidendi.* Oral argument was heard in January of 1986, and if there was any doubt as to the validity of Judge Drescher's disposition of the case, it has been a well-kept secret. Here, where on our review procedure we go directly to ascertain the views of the trial judge—Judge Drescher, who heard and saw the witnesses and had the benefit of a transcript of the judicial acknowledgement of the necessary papers—it was only required that we review Judge Drescher's determination.

A summary disposition reciting his decision and affirming it would have sufficed, and would have relieved the litigants of further anxiety months ago. As the Alaska Supreme Court noted in *S.O. v. W.S.,* 643 P.2d 997, 1001 n. 4 (Alaska 1982)—a case upon which the majority relies—a delay of even two months "is regrettable." The reason for this, the Court noted, is that "since the child will inevitably form emotional ties to its adoptive parents pending litigation which may make interference with the status quo both more damaging and more difficult than it otherwise would be." *Id.*

---

1. At oral argument, counsel for respondents stated: "I don't think there's any disagreement among counsel .... The *Matter of Andersen* found at 99 Idaho 805, 589 P.2d 957 is probably the guiding case by which this case should be decided." Counsel later on said: "We do receive a great deal of guidance from *Andersen* decision."

The majority opinion, rather strangely it seems, inserts the aside that: "One factor, however, appears to remain constant in all cases. When the natural mother changes her mind and litigation is instituted, there will be a considerable passage of time before there is any resolution. In the instant case, the custody of the child has been in the adoptive parents for more than two years, with the strong ties and emotional attachments which inevitably form." Slip op., p. 836. Nothing further in that vein follows, and it is presumed that the delay factor here involved is inferred as being some type of support of adopting the "best interest" *philosophy* espoused by Bakes, J., in his *Andersen* dissent. This is readily seen as the *non sequitur* it appears to be in context. Mrs. DeBernardi gave her consent at the judicial hearing of March 7, 1984. The revocation issue was heard eight weeks later by Judge Drescher, and his comprehensive opinion, (appended as Attachment I), was in the hands of the parties only fourteen days later!

The delay since then is wholly attributable to the system—over which this Court asserts an autocratic control and direction. It is the Court's Rule 82(c)(2) which allows a majority of district judges in each of seven districts of Idaho to assign *all* adoption proceedings to attorney magistrates. All means all, and all includes *contested* adoptions. It borders on the asinine for this Court to issue an opinion which contains language critical of the time delay which has been engendered by its own rule, while at the same time it has not bothered to make any rule which will expedite appeals in adoption cases. Contested adoptions should either (1) all be heard by district judges of district courts, and then go to and through *one* appellate level, *i.e.*, this Court, or (2) be heard by attorney magistrates of district courts, and then go to and through one appellate level, *i.e.*, this Court. (The final sentence of the Court's Rule No. 83(a)(3) shows how easily it could be done.) Now, if the majority is sincere in its philosophical aside which evoked this response, there should be an immediate change in the pertinent rules.

With proper rules in place, the appeal in this case filed on July 11, 1984, could have been ready for action by this Court as early as the first week in September, 1984. The reporter's transcript of 168 pages was prepared and filed at the end of two weeks after the district court reported it. Preparation of the clerk's record could not have encompassed more than one or two days. It also included 16 pages of good briefing by counsel for both parties—32 pages altogether. Briefs thereafter filed, with reference to the reporter's transcript were each but 26 pages long. This Court, on an appeal directly taken to it, after hearing oral argument, and were it of a mind to do so, without taking the additional time required to gratuitously overrule a prior opinion, could have issued a per curiam opinion adopting the decision of Judge Drescher, and affirming it over 20 months ago!

The majority's philosophical aside having spurred me to write that which I have been preaching, hopefully some good will come of that aside, which remains to be seen.

## II.

For the benefit of those 1200 or some attorneys licensed in Idaho since January of 1979, it may be well to point out that the Court in *Andersen* was not unaware of those jurisdictions which have espoused the "best interests" philosophy. Those are jurisdictions more given to the philosophies of Sparta than to Athens and Idaho. It was pointed out in *Andersen:*

> Such courts, though recognizing an initial right to custody on the part of the natural parent, nonetheless hold that right totally subordinate to the concern of the state, as *parens patriae*, in promoting the child's welfare and best interests. As such, they tend to recognize the rights of the "psychological parents," who have formed a "focus relationship" or "affective relationship" with the child, over the rights of mere "flesh and blood" which are asserted by the "biological parents." These jurisdictions hold the natural parents' consents to be irrevocable absent fraud or some overriding equitable consideration. *See In re Adop-*

*tion of Child by P,* 114 N.J.Super. 584, 277 A.2d 566 (App.Div.1971). *See also In re Holman's Adoption,* 80 Ariz. 201, 295 P.2d 372 (1956); *In re Child,* 1 Mass. App. 256, 295 N.E.2d 693 (1973); *In re Hendrickson,* 159 Mont. 217, 496 P.2d 1115 (1972).

The Idaho decisions, however, have stressed again and again, in a variety of contexts, the inherent rights of natural parents to the custody of their own children. *See, for example, Clayton v. Jones,* 91 Idaho 87, 416 P.2d 34 (1966); *Leonard v. Leonard,* 88 Idaho 485, 401 P.2d 541 (1965); *Smith v. Smith,* 67 Idaho 349, 180 P.2d 853 (1947); *Bedal v. Johnson,* 37 Idaho 359, 218 P. 641 (1923); *Jain v. Priest,* 30 Idaho 273, 164 P. 364 (1917). With such a background, we are more inclined to follow those jurisdictions which hold that, in the context of an adoption proceeding, the "contest between a parent and nonparent [may not] resolve itself into a simple factual issue as to which affords the better surroundings, or as to which party is better equipped to raise the child." *People ex rel. Scarpetta v. Spence-Chapin Adoption Service, supra,* [28 N.Y.2d 185] 321 N.Y.S.2d [65] at 72, 269 N.E.2d [787] at 792.

The Court of Appeals of Oregon, in language that we adopt as our own, has recently settled this question as follows:

> In the absence of any additional ground for an "estoppel" ... a more "acceptable" economic or emotional environment has never been approved as an adequate basis for the termination of parental rights which an adoption over the objections of a natural parent represents. The "best interests" rule has consistently been tempered by the refinement that
>
> " * * * courts should not interfere with the natural relationship of parent and child upon the sole ground that the proposed adoptive parents are able to give the child superior advantages over those within the means or social status of the natural parents * * *."

Where, as here, a natural mother not represented by legal counsel at the time consent is given attempts to withdraw that consent within a few weeks and thereafter takes reasonable steps available to regain the custody of her child, neither so-called "vested rights' nor superior economic or social position of the proposed adoptive parents will serve to deprive that withdrawal of legal effect.

The hardships produced by a separation of the child and the petitioners [the adoptive parents] at this time are in substantial measure the result of the petitioners' resistance to the natural mother's efforts to regain custody. Those hoping to become adoptive parents cannot create their best argument for keeping a child's custody by thwarting a natural parent's known wishes.

*Small v. Andrews,* 20 Or.App. 6, 530 P.2d 540, 544–45 (1975). *Andersen, supra,* 99 Idaho at 814–15, 589 P.2d at 966–67.

For these reasons, then, I concur in the majority's decision to affirm Judge Drescher, but I dissent from the majority's unwise and uncalled-for decision to overrule *Andersen.* The majority turns to the best interests standard instead, a standard which will spawn unending testimony of social do-gooders who constantly espouse that doctrine in this Court—all to the denigration of Idaho's long-time satisfaction with the belief that natural family ties be preserved and encouraged to the fullest extent possible.

## ATTACHMENT I

IN THE DISTRICT COURT OF THE THIRD JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF GEM

MAGISTRATE DIVISION, EMMETT

In the Matter of the Petition of Adopting Parents.

Case No. *267*

MEMORANDUM AND ORDER

DRESCHER, Magistrate.

Mary Ann DeBarnardi consented to the adoption of her newborn child on March 7,

1984. A petition for adoption was filed on March 9, 1984, predicated, in part, on the consent. Ms. DeBarnardi filed a written revocation of consent on March 20, 1984. A hearing was had on the revocation May 11th with Mr. Roderick Gere appearing on behalf of Mary Ann DeBarnardi and Mr. Scott E. Fouser appearing on behalf of the adoptive parents who are, of course, contesting the revocation.

The last years have been hard for Mary Ann DeBarnardi. In 1981 and 1982 the 36 year-old woman found herself recently divorced from a marriage of long duration retaining custody of four children ages 18 through 6. During that period she had little or no financial resources and was in a desperate position. She saw an add in the newspaper requesting surrogate parents and responded thereto. The telephone number in the advertizement led her to the office of Payette attorney Bert Osborne. Osborne informed her that he had three couples who were looking for a surrogate mother. A fee was to be paid for this service in the amount of $7,000.00 and all medical costs and attorney fees would likewise be paid by the adoptive parents. These negotiations were never fully consummated.

Meanwhile, in October, 1982, while working in the Iron Hand, a Nampa bar, she met and became romantically involved with 59 year-old Chet Swan, a retired brick layer and convicted felon who lived without apparent financial resources. Mr. Swan and Ms. DeBarnardi lived together in the DeBarnardi home and in July, 1983, Ms. DeBarnardi discovered that she was pregnant.

In September, 1983, DeBarnardi and Swan's relationship had deteriorated and Mr. Swan had moved out. Being confused and somewhat desperate Ms. DeBarnardi called Bert Osborne and advised that she was pregnant and that she desired to give the baby up for adoption. Thereupon Osborne and DeBarnardi discussed following the "same procedure" previously contemplated with regard to the surrogate parent situation. Mr. Osborne advised Ms. DeBarnardi to secure independent legal counsel.

Ms. DeBarnardi then sought legal counsel from Nampa attorney L. Kim McDonald. She had come to know McDonald while performing custodial services in his building. McDonald had likewise handled DeBarnardi's earlier divorce and a friendly relationship evolved between the two as well as a professional one. Once counsel became involved there is a conflict in the testimony concerning whether or not the $7,000.00 was still to be paid. DeBarnardi testified that McDonald led her to believe that the $7,000.00 would still be paid if done under discreet and lawful circumstances. McDonald however denies that he ever counseled that money should be received for an adoption. He moreover asserts that he specifically advised against any money changing hands because of a then current episode in Mountain Home, Idaho, wherein certain individuals were criminally charged for accepting money in an adoption. The point seems moot at this juncture as DeBarnardi maintains that her interest in receiving money was only as a surrogate mother and that once adoption was considered she no longer desired to receive money.

Although the record is unclear, sometime during this period DeBarnardi's financial circumstances improved. She now holds a position with a local food processor and earns $760.00 net per month. In addition she receives $500.00 per month child support. She works straight night shift and according to Mr. McDonald this fact was one of the continuing concerns which induced Ms. DeBarnardi to contemplate adoption throughout the term of her pregnancy.

In September, 1983, a "surrogate mother agreement" was entered into between Bert Osborne, acting as agent, and Mary Ann DeBarnardi, with the advice and consent of her attorney, Mr. L. Kim McDonald. Even though adoption was contemplated the contract in question was still couched in terms of the surrogate mother understanding. This agreement contains provisions wherein the natural mother agrees to surrender the child to the adopting parents and that they agree to take the child even if it is

born with defects, etc. and to pay any costs of delivery and related legal fees, etc. Shortly after signing this agreement Ms. DeBarnardi counseled with a health and welfare social worker named Steve Davenport. Ms. Debarnardi said she expressed some concern about the proposed adoption and reviewed her facts and circumstances with him but Davenport offered no concrete advice beyond suggesting that it was her decision to make.

In November or December, 1983, Bert Osborne, himself became embroiled in legal difficulties and withdrew from participation in the negotiations. The ____ who he was representing, thereupon contacted Mr. McDonald who made a referral to Mr. Scott Fouser who appears as their counsel in this action. It was also during December, 1983, that Ms. DeBarnardi received $50.00 from the ____ as a Christmas gift. Other than attorney fees, medical costs and the like this is the only money ever paid to DeBarnardi.

Ms. DeBarnardi alleges that in February, 1984, she began making her consent to the adoption conditional. She alleges that she imposed certain requirements i.e., child be raised out of state, that it be reared in the Roman Catholic faith, and that the adoptive parents be childless. McDonald denies that any of these demands were made and the ____ moreover point to the September agreement and the written consent form as indicative of the fact no such demands or conditional requirements were ever proposed by DeBarnardi or reduced to writing.

It was approximately in this February period that DeBarnardi alleges that McDonald began to call regularly to inquire of her health, etc. On March 4, 1984, Ms. DeBarnardi secretly went to the hospital and on March 5, 1984, she delivered a baby boy. Mr. Swan visited her in the hospital at approximately 4:00 a.m. that date and later in the morning McDonald arrived at the hospital and had DeBarnardi sign a document releasing the child into McDonald's custody. At this point McDonald advised Ms. DeBarnardi that they had a scheduled court appearance for March 7,

1984, but she expressed some reluctance to attend the court hearing on that date because of physical discomfort associated with the birth and consequential tubal ligation. Ms. DeBarnardi alleges that at that time she questioned the propriety of consenting to adoption but was reassured of its propriety by McDonald.

Chet Swan made on additional visit to the hospital to view the child. He was not informed that DeBarnardi proposed to give up the child and was never consulted on that issue. At trial, Swan testified that he and DeBarnardi were contemplating marriage although he had never asked her outright. He acknowledges paternity.

During her hospital stay Ms. DeBarnardi was also counseled by Bev Putnam who was the Director of Social Services, Caldwell Memorial Hospital. Ms. Putnam counseled with DeBarnardi for one hour on March 5, 1984. Although DeBarnardi testified that she advised Putnam that she, DeBarnardi, was "being pressured in consenting" Putnam's testimony is at variance therewith. Putnam says she reviewed the issue of adoption and its alternatives with DeBarnardi including the issue of babysitting and financing and that DeBarnardi seemed set to consent to the adoption of the child and it seemed to be what she wanted to do. Putnam also spoke with DeBarnardi on one other occasion. During her stay DeBarnardi asked Putnam to restrict visitors to the hospital and to insure that Ms. DeBarnardi was allowed to leave the hospital before McDonald left with the child.

On March 6, 1984, DeBarnardi was released from the hospital and McDonald's wife, Dianne, drove DeBarnardi home while McDonald followed in his car. The next day McDonald and Ms. DeBarnardi went to the Canyon County Courthouse to execute a consent to adoption before Magistrate Milton Birnbaum. (See attached transcript of hearing.) [See Attachment 2]

Prior to arriving at the courthouse and then again at the courthouse prior to the entry of the judge, McDonald and DeBarnardi reviewed the areas that would be

covered in counsel's inquiry. DeBarnardi testified that McDonald had her read and review the consent but there was no copious review of her rights. Moreover, DeBarnardi asserts that McDonald instructed her to testify that the father of the child was unknown.

McDonald's testimony differed from DeBarnardi's. McDonald alleges that while riding the elevator to the second floor of the Canyon County Courthouse he asked DeBarnardi if she was sure she still wanted to proceed with the adoption and the execution of the consent. He advised her that it was not too late to change her mind but that she expressed her desire to proceed. McDonald moreover testified that he thoroughly explained the consent to DeBarnardi and upon inquiring if she had questions she indicated no. He denies that he coached her to say the father was unknown and in fact testified that throughout the course of Ms. DeBarnardi's pregnancy she had given him conflicting versions of the child's paternity.

The hearing was most thorough in nature. Although it does not appear from the naked transcript, the ambiance upon listening to the recorded record is one of a relaxed, unhurried and deliberate inquiry. DeBarnardi did not testify that her relinquishment of parental rights was conditional. The language of the written consent likewise expresses no conditional terms. The language of the consent not only is a complete relinquishment of parental rights but also constitutes a waiver of notice and appearance in further proceedings. *Himmelberger v. Robinson*, 102 Idaho 225, 628 P.2d 1059 (1981).

This consent was executed by Ms. DeBarnardi after inquiry by McDonald and Fouser. The Court asked no questions.

Ms. DeBarnardi testified that in the days following the execution of her consent she became distraught. Because McDonald was out of town she alleges she called McDonald the following Monday, March 12, expressing a desire to withdraw her consent. She made several further efforts to call the Court and her Health and Welfare

case worker. She eventually secured counsel and initiated revocation proceedings.

Ms. DeBarnardi testified that the essence of her desire to revoke is predicated upon her belief that she can care for the child herself and the fact that she has simply changed her mind in consenting to the child's adoption.

Mr. McDonald also testified that he had been representing Mary Ann DeBarnardi for two or three years and throughout that duration she discussed being a surrogate mother. In September, 1983, when it became known that Ms. DeBarnardi was pregnant he counseled DeBarnardi the various alternatives; abortion, adoption, etc., and eventually Ms. DeBarnardi decided to keep the child but place it for adoption. McDonald thereupon began negotiating with Bert Osborne, McDonald indicates that the original surrogate mother agreement was retained because of DeBarnardi's concern that the adoptive parents might back out or might not take a defective child and that the agreement in question contained language insuring against those perils. McDonald alleges that money was discussed but he consistently counseled against receiving money and that at no time did DeBarnardi ever qualify her consent on the grounds of religion, out of state residency or the like.

Contrary to the testimony of DeBarnardi, McDonald alleges that after returning from the hospital he and his wife visited in the DeBarnardi home for some period and had an opportunity to pass through the home and view all the rooms. Nowhere therein, according to McDonald, did he view a bassinet or baby clothes purchased in anticipation of the child's birth. McDonald's first recollection of any desire not to consent to an adoption was in a call to him approximately 7 to 10 days after the May 7th court hearing. During that conversation McDonald alleges that DeBarnardi was accusatory and belligerent whereupon he suggested that she secure other counsel. McDonald does concede that $2,000.00 in attorney fees for his representation of DeBarnardi in this matter was

paid by Fouser who was serving as a conduit for the funds from the adoptive parents.

The adoptive parents, ____ were called in opposition to the revocation and testified that they have had custody of the minor child since March 7, 1984, and have renamed the child Scott. That a bond of love and affection has grown between them and the minor child and they have expended considerable sums of money on the child's health and well being as well as attorney fees to Fouser and McDonald. ____ testified that while being represented by Mr. Bert Osborne it was discussed that money should be paid to the adoptive mother should she be in financial distress, etc., however once they became represented by Fouser, he absolutely forbid any exchanging of money, a position in which McDonald concurred according to

The leading Idaho Case on adoption is *In Re: Anderson*, 99 Idaho 805, 589 P.2d 957 (1978). The *Anderson* decision seemingly turns on two policy considerations. (1) The assertion of inherent rights of natural parents to the custody of their own children, and (2) that due process considerations be observed in consenting to adoptions, i.e., that although a consent to termination of parental rights and a subsequent adoption can constitute a general waiver it must be demonstrated that waiver was voluntary, knowledgeable and intelligently made with full awareness of the legal consequences.

To fulfill these larger policy considerations the *Anderson* decision held that a natural parent should be permitted to revoke a valid consent unless estopped from doing so. According to *Anderson*, the elements to be considered by the trial court in ascertaining whether or not the consent should be revoked are: (1) The circumstances under which the consent was given. (2) The length of time elapsing and the conduct of the parties between the giving of the consent and the attempted withdrawal. (3) Whether or not the withdrawal was made before or after the institution of adoption proceedings. (4) The nature of the natural parents' conduct with respect

to the child both before and after consenting to its adoption. (5) The vested rights of the proposed adoptive parents with respect to the child.

These considerations, formulated in the *Anderson* case, were predicated on specific facts of the *Anderson* litigation. Consequently the facts should be reviewed in detail. In 1976 when Kim Anderson was 21 years of age or less and unwed she became pregnant by one Robert Anderson. During her pregnancy, Kim, her aunt and social worker located prospective adoptive parents named the Crapos. It was arranged that Crapos would adopt the unborn child but Kim changed her mind during labor. Approximately four weeks after the baby's birth, Kim again decided to permit the Crapos to adopt the child. During this period, Kim had been living with her parents and was subject to extreme family pressures. Her father was apparently an alcoholic, her mother was of little or no support, bizarre incidents were conducted repeatedly in the family home and Kim was with little or no means of support. Her parents also failed or refused to help contribute towards the support of her new baby.

Under these very trying conditions Kim Anderson again changed her mind. She contacted the Crapos and again offered them her baby. They met in a cafe where custody was transferred and then proceeded to a bank where all parties endorsed consents before a notary public. The Andersons after executing the consents left for California where Kim was obliged to take her other children for visitation. While there they had a change of heart. They called the Crapos and demanded the return of the child but were unsatisfied. They secured California counsel who wrote the Crapos and likewise demanded the return of the child. They returned to Idaho approximately one month later and several months after that initiated habeas corpus proceedings for the return of the child.

Let us then apply the facts and teachings of *Anderson* to the case at hand. (1) *The circumstances under which the consent*

*was given.* In the *Anderson* case a young, unmarried woman gave her consent to adoption without benefit of counsel and in the lobby of a bank. The evidence in that case profiled a young woman with no one to turn to and advise her in the matter and that she was under considerable amount of financial and familial distress. In this case, a more mature woman had the benefit of counsel throughout the period of pregnancy and for a material period of time before; she had reviewed the matter on a number of occasions with her attorney and also discussed and reviewed the pros and cons of the adoption versus other alternatives. She also had the benefit of consultation with a social worker during the term of her pregnancy, and gave her consent before a duly appointed judicial officer during the course of a rather thorough hearing.

(2) *The length of time elapsing and the conduct of the parties between the giving of the consent and the attempted withdrawal.* In the *Anderson* matter the time elapsing between the giving of the consent and the attempted withdrawal was a matter of several months. In the instant case Ms. DeBarnardi attempted to withdraw her consent within a few days of giving the same.

(3) *Whether or not the withdrawal was made before or after the institution of the adoption proceedings.* As in the *Anderson* case, Ms. DeBarnardi attempted to withdraw her consent after the institution of adoption proceedings.

(4) *The nature of the natural parents' conduct with respect to the child both before and after consenting to its adoption.* In the *Anderson* case the natural mother attempted to parent the child for some time in the home of her parents. This proved to be an unsuccessful arrangement for both her and the child as they were in a pernicious environment and under acute financial distress. The natural parent in the case at hand was gainfully employed and receiving an additional $500.00 per month for the children she had at home. Her short consort with the child born to her was in the hospital and did not extend for weeks at a time as did Anderson's. Ms. DeBarnardi testified that in advance of the birth she bought a number of accoutrements for the newborn. Mr. Swan testified that he also viewed these. Mr. McDonald however testified that upon returning home from the hospital with Ms. DeBarnardi he had occasion to peruse her entire home and saw no personal effects purchased for the child.

(5) *The vested rights of the proposed adoptive parents with respect to the child.* Mr. and Mrs. ____ testified that they have had uninterrupted custody of the child since March 7, 1984. During that period the child has come to be perceived as a member of their family. They have renamed the child. They have expended considerable sums in regard to medical attention for the child as well as the attendant legal fees involved in the adoption. Both testified that they are emotionally attached to the child and they perceived him to be as one of the family.

The Court might note two additional elements which lend validity to the consent in this matter. First of all there is not the slightest bit of evidence that the consent was induced by fraud or duress. Although there was some mention of money being paid to Ms. DeBarnardi she herself testified that once the transaction shifted from that of surrogate mother to adoption she neither anticipated nor desired any money.

Ms. DeBarnardi had had the benefit of counsel for months if not years. Her rights were thoroughly explained to her over this period. The consequences of her actions were well known to her. She had access to a number of counselors.

The primary legal focus of *Anderson* was upon the procedural inadequacies observed in Kim's execution of her consent.

I.C. § 16–1506 provides in pertinent part:

Any person or persons whose consent is required shall execute such consent in writing, and acknowledge the same before any officer authorized by the laws of this or any other state to take ac-

knowledgement of deeds, which consent being filed in the court where application is made, shall be deemed a sufficient appearance on the part of such person or persons.

This is the procedure followed in *Anderson*, a simple execution of a consent before a notary public. The consent itself then works as a general appearance and waiver of further notice.

Now, the teaching of *Anderson* was that if the consent operates as a waiver, then to be effective the law must be assured that the waiver is voluntary, knowledgeable and intelligent and made with a full awareness of the legal consequences. This lesson was not lost on the counsel.

⎩ A full judicial proceeding was had to secure the execution of the consent. The procedures preferred by the Supreme Court and set forth in I.C. § 16–2001 et. seq. were substantially followed. Ms. De-Barnardi in fact executed the consent freely, voluntarily, intelligently, knowingly and with full knowledge of its consequences. There was no fraud or duress. All circumstances of the legal effect of the adoption and DeBarnardi's rights therein were made known to her.

This case presents a most compelling exposition of fundamental human concern. A mother for her new-born child and adoptive parents seeking to claim the child in the stead of one never born to them naturally. Ms. DeBarnardi and her able counsel have presented the best possible case that could be put forward. She is the natural mother and she acted with alacrity in seeking to revoke her consent. And yet, at its most basic level Ms. DeBarnardi simply changed her mind. In conformity with her prior intent many people changed their position to their detriment and this Court will now estoppe her from again changing her course of action.

Again, Ms. DeBarnardi presents a sympathetic figure placed in a number of unfortunate situations, many of which were not of her own doing. Nonetheless the application of these facts to prevailing law leads this Court to believe that her petition to revoke her consent and her Motion to Dismiss must be DENIED.

IT IS SO ORDERED.

DATED This 25th day of May, 1984.

ATTACHMENT II

TRANSCRIPT

TRANSCRIPT OF CONSENT

TAKEN IN THE MAGISTRATE .COURTROOM, CALDWELL SECTION

AT CALDWELL, IDAHO

MARCH 7, 1984

APPEARANCES:

MR. L. KIM McDONALD, Attorney at Law, 912 12th Ave. So. Suite A, Nampa, Idaho 83651, appearing for the natural mother, Mary Ann DeBernardi.

MR. SCOTT FOUSER, Attorney at Law, 912 12th Ave. So. Suite B. Nampa, Idaho 83651, appearing for the Petitioners.

\*  \*  \*  \*  \*  \*

THE COURT: In the matter of: Mary Ann DeBernardi, for the adoption of baby boy DeBernardi, and for the County of Gem State, of Idaho. This is the consent of the natural mother. Now would you please rise to be sworn. Stand up please, raise your right hand.

COURT CLERK: You do solemnly swear the testimony your are about to give in this matter, will be the truth, the whole truth, and nothing but the truth, so help you God?

MS. DeBERNARDI: I do.

THE COURT: Be seated, please.

MR. McDONALD: Okay, would you state to the Court, your name please, for the record?

MS. DeBERNARDI: Mary Ann DeBernardi.

MR. McDONALD: And you're the natural mother of a baby boy, that was born on

March 5, 1984, in Caldwell Memorial Hospital?

MS. DeBERNARDI: Yes.

MR. McDONALD: Now, your here this morning to give your consent for the adoption of this baby, is this correct?

MS. DeBERNARDI: Yes.

MR. McDONALD: Okay, Mary Ann, how old are you?

MS. DeBERNARDI: 36.

MR. McDONALD: And what is the extent of your education?

MS. DeBERNARDI: 12th grade.

MR. McDONALD: Did you graduate from High School?

MS. DeBERNARDI: Yes.

MR. McDONALD: And do you have other children?

MS. DeBERNARDI: 4.

MR. McDONALD: Are they presently all at home?

MS. DeBERNARDI: Yes.

MR. McDONALD: Okay, are you married?

MS. DeBERNARDI: No.

MR. McDONALD: Do you know ... do you know the father of this child?

MS. DeBERNARDI: No.

MR. McDONALD: Okay, are you presently under any medication of any sor ... type, or have you been in the last, say, 24 hours?

MS. DeBERNARDI: Just Emperin.

MR. McDONALD: And this Emperin is for what?

MS. DeBERNARDI: Just pain.

MR. McDONALD: Pain. And you are not under the influence of any drugs, or alcohol then, of any sort, from the last 24 hours?

MS. DeBERNARDI: No.

MR. McDONALD: Okay, has anybody threatened you, or coerced you, into assigning this consent of adoption?

MS. DeBERNARDI: No.

MR. McDONALD: Your doing this of your own free will?

MS. DeBERNARDI: Yes.

MR. McDONALD: Has anybody made you any promises of any kind, to get you to sign this consent?

MS. DeBERNARDI: No.

MR. McDONALD: Have you ... Mary Ann, have you done any counseling with anybody, before you determined that this is the route that you wanted to go?

MS. DeBERNARDI: Bev Putman, and Steve Davenport.

MR. McDONALD: Okay, who is Bev Putman?

MS. DeBERNARDI: She is the counselor at the hospital.

MR. McDONALD: She is a Social Services Director, at the Caldwell Memorial Hospital?

MS. DeBERNARDI: Yeah.

MR. McDONALD: And how many sessions did you have with her?

MS. DeBERNARDI: Two.

MR. McDONALD: Okay, and then who is the other person?

MS. DeBERNARDI: Steve Davenport, from Health & Welfare.

MR. McDONALD: And you did counsel with him?

MS. DEBERNARDI: Yes.

MR. McDONALD: And after your counseling, did you arrive at your decision, that you're doing today?

MS. DeBERNARDI: Yes.

MR. McDONALD: Okay. How long have you known, that you were going to give this child up for adoption?

MS. DeBERNARDI: Probably the whole 9 months. I ... I just not being married, I can't afford it, no more children.

MR. McDONALD: Okay, what other reasons is there, that you want ... the reason you want to give the child up?

MS. DeBERNARDI: Because, I just don't feel like I can take good care of it,

working the shift I do, and the children that I have at home.

MR. McDONALD: Do you feel that your age has any bearing on the decision your making?

MS. DeBERNARDI: Yes, cause my ...

MR. McDONALD: ... And why is that?

MS. DeBERNARDI: Because, my youngest is 6, and I'm 36, and baby just, you know, they need more time and more patience than I've got.

MR. McDONALD: Okay now, you have read over a consent this morning, and you have signed that consent, I'll hand you a copy of the ... of the consent, and ask you if that's your signature? I'm handing you what is labeled, consent of natural mother, and is dated March 7, 1984, is that your signature there?

MS. DeBERNARDI: Yes.

MR. McDONALD: Okay. Now, in consenting to giving up your child for adoption, do you realize that this is a permanent situation?

MS. DeBERNARDI: Yes.

MR. McDONALD: And that by doing so, you're giving up all rights to this child?

MS. DeBERNARDI: Yes.

MR. McDONALD: And this includes the right, for him to inherit from you, and like wise, for you to inherit from this child?

MS. DeBERNARDI: Uh hum.

MR. McDONALD: That in essence, when this child is adopted, it will be for all intents and purposes, that the child of the new people, and you will have no more contact, or association with this child?

MS. DeBERNARDI: Yes.

MR. McDONALD: Okay. And knowing this, you still desire to sign this consent?

MS. DeBERNARDI: Yes.

MR. McDONALD: Okay, I have no further questions, do you Mr. Fouser?

THE COURT: Mr. Fouzer?

MR. FOUSER: I have a couple of questions, your Honor?

THE COURT: Go ahead, Mr. Fouser.

MR. FOUSER: Mary Ann, how long have employed Mr. McDonald, as far as representing you in this adoption?

MS. DeBERNARDI: Since shortly after I found out I was pregnant.

MR. FOUSER: So about, say 8 and a half, 9 months?

MS. DeBERNARDI: Yeah.

MR. FOUSER: And has he explained your various rights to you on other occasions, besides this morning? That is the rights your giving up.

MS. DeBERNARDI: Yes.

MR. FOUSER: So, you fully understand those rights?

MS. DeBERNARDI: Yes.

MR. FOUSER: Okay. You understand that after the adoption is complete, the records will be sealed by the Court, and you won't be able to find out where the child has gone, that is it will be someone elses child.

MS. DeBERNARDI: I don't really want to know.

MR. FOUSER: Okay, I don't have any further questions.

THE COURT: Did you have anything further Mr. McDonald?

MR. McDONALD: No, your Honor.

THE COURT: You may step down. The record will further reveal that Mr. Tim McDonald, was present interrogating the natural mother on her behalf, and Mr. Scott Fouser on behalf of the Petitioners. Is that correct?

MR. FOUSER: That's correct, Sir.

MR. McDONALD: Yes, your Honor.

THE COURT: Very well. Did you have anything further?

MR. McDONALD: Nothing further, your Honor.

THE COURT: The Court witnesses the consent of the natural mother.