**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 47230**

| | |
|---|---|
| In the Matter of: John Doe I,<br>A Child Under Eighteen (18) Years<br>of Age.<br>------------------------------------------------------------<br>STATE OF IDAHO, DEPARTMENT OF<br>HEALTH AND WELFARE,<br><br>    Petitioner-Respondent,<br><br>v.<br><br>JANE DOE (2019-22),<br><br>    Respondent-Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Boise, November 2019 Term<br><br>Opinion Filed: April 16, 2020<br><br>Karel A. Lehrman, Clerk |

Appeal from the Magistrate Court of the Third Judicial District of the State of Idaho, Canyon County. A. Lynne Krogh, Magistrate Judge.

The judgment of the magistrate court is <u>vacated</u> and <u>remanded</u>.

Scott J. Davis, Canyon County Public Defender's Office, Caldwell, for appellant Jane Doe.

Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent State of Idaho, Department of Health and Welfare.

---

STEGNER, Justice.

This case involves an appeal of the termination of a mother's right to parent her young son, John Doe (Son). Jane Doe (Mother) executed a voluntary consent to terminate her parental rights to Son. Mother shortly thereafter filed a motion to rescind her consent. The magistrate court denied the motion. Termination proceedings were then conducted without Mother, her counsel, or a guardian ad litem for Mother being present. Following the hearing, Mother's parental rights were terminated. Mother timely appealed the termination of her parental rights. For the reasons set forth below, we vacate the judgment of the magistrate court.

# I.    FACTUAL AND PROCEDURAL BACKGROUND

## A.  Events leading up to and including removal.

Mother became pregnant with Son in 2015. Before Son's birth, Son's father (Father) contacted the Department of Health and Welfare (the Department) to indicate that he was the putative father. (A paternity test would later confirm Father's parentage.) Son was the result of an affair between Mother and Father while Father was married to another woman (Wife). Father and Wife remained married.

While Mother was pregnant, several reports were made to the Department about Mother's mental health that challenged her ability to care for Son. The first report was from "an individual who [knew Mother] and thought he might be the father of her unborn child."[1] This individual indicated that Mother was "'off her mental health medications,' and had been 'acting out and aggressive toward' the individual and his family. This individual was very concerned for [Mother's] mental health and how that would impact the child." The second report came shortly before Son's birth, when Mother threatened physical violence against a staff member at Valley Medical Clinic. Mother said she was going to blow up the clinic. She was also reportedly demanding to be induced because her "life was in danger because of the pain."

Son was born November 2, 2015. That same day, the Department received a referral from hospital staff, including nurses, doctors, and social workers, who "had concerns regarding [Mother's] mental health and her ability to provide consistent care and protection for her newborn son." Son was removed from Mother four days after his birth. The Department "had concerns that [Mother's] impulsive, aggressive and violent behavior could be directed at [Son], placing him at significant risk of injury." Son was ultimately placed with Father and Wife when Son was six months old.

Son lived with Father and Wife until the events giving rise to this case. Mother made attempts to visit Son between November 2015 and March 2016, after which she apparently relocated to California.[2] Father and Wife had two children of their own, and Wife had four additional children living with her from a previous marriage. During the time Son lived with Father and Wife, Mother was limited to supervised visits with Son.

When Son was eighteen or nineteen months old, Wife's mother—Son's step-grandmother

---

[1] It is unclear whether this was in fact Father.

[2] The timing of Mother's relocation to California is unclear. Mother appears to have also lived in California prior to Son's birth.

(Step-Grandmother)—came to visit Father and Wife with plans to babysit the seven children while Father and Wife left the state on vacation. Step-Grandmother observed that Son was physically very small, and was favoring one arm over the other. Within a few days, Step-Grandmother also noticed bruising and swelling on Son's arm.

On June 27, 2017, Step-Grandmother took Son to an urgent care facility. Staff there directed her to take Son to the emergency room, which she did; Step-Grandmother was then directed to take Son to St. Luke's Children at Risk Evaluation Services (CARES). Son was admitted at CARES with malnutrition-type symptoms. Upon examination, he was also diagnosed with a fractured right humerus and an avulsed scapula from a pulling-type injury. He was severely underweight, having not gained weight since his six-month checkup. He did not crawl, walk, or talk. It was determined that Son was "environmentally delayed, meaning that he had delayed development attributable to his environment and not to illness, injury, or defect." In particular, the Department observed that it appeared that Father and Wife "minimized their involvement in" Son's care.[3]

On June 27, 2017, Son and two other young children in the home were placed in foster care after the Department declared that these children were in imminent danger because of Son's injuries and apparent neglect. At the time Son was removed from Father and Wife, Mother was residing in California.

**B. Shelter care hearing and adjudicatory hearings.**

A shelter care hearing was held on June 29, 2017, at which Father and Wife stipulated that the Department had reasonable cause to believe that there was an unstable home environment. They also agreed that it was in the best interests of the three children who had been removed to keep them in temporary shelter care, pending an adjudicatory hearing. Mother was not present for the hearing.

On July 27, 2017, an adjudicatory hearing was held before Magistrate Judge Kotyk at which Mother was present.[4] Step-Grandmother testified about the timeline of her discovery of

---

[3] For example, a visit to Father and Wife's home by a Department worker revealed that Son slept in a pack-and-play and his clothes were kept on a small changing table. The other children in the home had their own beds and dressers. In addition, Father and Wife only displayed photos of the two children they had together.

[4] Multiple magistrate judges presided over this case or handled ancillary matters. Judge Kotyk presided over the early adjudicatory hearings in 2017 (June, July, and August 2017). Judge Tucker presided over the remaining hearings in 2017 and 2018, as well as several hearings in early 2019. The termination trial was presided over by Judge Krogh, and all decisions appealed by Mother were made by Judge Krogh. Mother executed the consent form before Judge Ellis. Judges Kotyk, Tucker, and Krogh all preside in the Third District. Judge Ellis is a Fourth District

Son's injuries. The court granted a continuance of the adjudicatory hearing because the consulting physician who examined Son at CARES was unavailable.

Counsel for Mother then requested that Mother be allowed extended home visits with Son, to which the Department objected because it had not evaluated her home situation. At the time, Mother was still living in California even though she said she had every intention of relocating to Idaho. The court determined that Son could not be taken to California, and noted that there had been no investigation into the suitability of Mother's housing. Accordingly, the court denied the request to have extended home visits "until the Department can find out what exactly [Mother's] living situation is[.]" Mother protested the court's ruling at length, for example complaining that it was not fair that Father and Wife "get their kids back, but my son has to stay in foster care even though they have concerns for all three of the kids?"[5] In response, the court stated that the existing custody order with respect to Son limited Mother to supervised visitation only, so extended home visits were out of the question at that time. The adjudicatory hearing was then continued.

On August 29, 2017, the adjudicatory hearing resumed. At that time, Mother's counsel indicated that Mother had moved back to Idaho and asked that the Department evaluate her living conditions so Mother could progress towards extended visitation with Son. The parties stipulated to keep all three children in protective custody, and the court approved this plan, also requiring a protective parenting class for all three parents—Father, Wife, and Mother.

**C.  Mother's supervised visits and interactions with the Department.**

The Department scheduled supervised visits between Mother and Son after he was removed from Father and Wife's home. The first scheduled visit occurred in July 2017, approximately three weeks after Son's removal. During the visit, Mother began to act erratically and made accusations about Father and Wife. The foster parent was present, and began to record

---

Magistrate Judge. It is not clear from the record how or why the termination proceeded in the Third District, while Mother's consent was conducted in the Fourth District. While we recognize the press of cases in magistrate court, the practice of assigning the same child protection case to different magistrate judges is not appropriate. It should only be employed when no other option is available. If a different judge is assigned, a record of the reason necessitating the assignment should be made. Once a magistrate judge is assigned to a child protection case, it is *always* the best practice for that judge to retain responsibility for the case until its conclusion. *See* Nat'l Council of Juv. & Fam. Ct. Judges, *Enhanced Resource Guidelines: Improving Court Practice in Child Abuse and Neglect Cases* 34 (2016) (advocating use of "one family-one judge system" throughout the life of a child protection case) ("When cases are heard in multiple courts by multiple judges, conflicting court orders and failure to share information among all involved creates havoc for families.").

[5] Father and Wife were not reunified with the two children removed from their custody until Father and Wife completed a parenting plan; reunification did not occur until months later in April 2018**.**

the conversation. Mother became agitated and her speech turned very volatile. The visit was ended when the visitation technician observed that Mother was not being careful of Son's injuries. Mother then shouted invectives including verbally aggressive threats and profanity against workers in the visitation facility before she was escorted from the office by law enforcement. Mother returned to California shortly after this visit; nevertheless, the Department provided her with a Greyhound bus ticket to return to Idaho at the end of August 2017.

Upon Mother's return to Idaho, numerous supervised visits occurred over the next few months. Many visits were marred by similar erratic behavior, including Mother's inability to control her anger and her utter disregard of Department protocol and instruction. During one visit, Mother attempted to bring Son to the facility lobby to introduce Son to her current boyfriend. When told she could not do so, Mother protested and took him there anyway. Mother became upset in the lobby, yelling that she was being treated like a criminal. On another occasion, Mother was met by a visitation technician in the lobby to be escorted to the visiting room; not seeing Son with the technician, Mother began using profanity and demanded to be told where her child was. She began to pound on doors leading to visiting rooms and offices. When told to calm down, she proceeded to threaten the technician and charged at her. Law enforcement was again called. Mother also missed several visits. On one occasion Mother claimed to have "blacked out" while riding her bike to the visit, necessitating a hospital visit.

Mother's engagement with Son during these visits was inconsistent at best. While the visits were occasionally positive, they were more often negative. For example, Mother often attempted to feed Son food that was too hot, not safely prepared, or otherwise inappropriate. On several occasions Mother played tricks on Son by giving him nasty-tasting gag candy or a sour Warhead. During a visit on Halloween, Mother colored Son's hair green with a Sharpie marker, and drew scars on Son's face with lip gloss. Mother also interacted with Son in an unsafe manner multiple times. On one visit, she spun Son in circles to make him dizzy, and then laughed uncontrollably as he tried to walk and fell. On another occasion, Mother tripped Son as he ran past her.

The supervised visits also showed that Mother used profanity and verbal threats against facility workers, and then blamed the Department and Son's case manager (Social Worker) for her own inability to control her temper. This escalated over the months of her supervised visits. At the end of one visit, the visitation technician informed Mother that the visit was over, after

which Mother began to raise her voice and protest about her case. One visit began with Mother complaining loudly—to no one in particular—in the facility lobby about how she was being treated like a criminal because Son had been taken away from Father and Wife, not from her. During other visits, Mother's preoccupation with the Department and the Social Worker prevented Mother from paying attention to Son.

### D. Mental health evaluations, appointment of a guardian ad litem, and increasing disruption in court and with visitations.

On November 9, 2017, Mother met with Dr. Firth, a clinical psychologist, to undergo a psychological evaluation. The evaluation was cut short after Mother became "explosive." Firth's diagnosis, based on the questions Mother had answered, was "Axis I schizo-affective disorder, bipolar type, R/O[6] schizophrenia paranoid type." Firth observed, "[t]his person in this psychologists [sic] opinion will never be stable enough to parent a child. She is lost in the real world and is in denial as to her condition thinking everyone else is wrong and out to get her."

A status hearing was held in November 2017 before Judge Tucker. During this hearing, Mother disrupted witness testimony, and eventually excused herself from the courtroom while the hearing proceeded. The Department moved to temporarily suspend in-person visits because of the visitation issues at the facility, and so Mother could focus on her mental health plan. Taking note that the six-month review hearing was approximately one month away, the court instead decided to establish some ground rules for Mother via a behavior contract, and to see how the following four weeks proceeded.

During this discussion, the court also noted that Mother's trouble regulating herself had led to significant breakdowns in communication between the Department and her. The court accordingly appointed Mother's then-counsel, Michael Nelson, to be her guardian ad litem.[7] The

---

[6] "R/O" is shorthand for "rule out," a phrase used by diagnosticians. In the context of mental health evaluations, a diagnosis containing the phrase "rule out" signals evidence that the diagnostician is reasonably certain the patient meets the full criteria for the disorder, but that the diagnostician needs more information to "rule out" this disorder or to make a definitive diagnosis. *See* Albert Roberts & Gilbert Greene, *Social Workers' Desk Reference* 184, 188 (2002). The phrase "rule out" has been replaced by "provisional diagnosis" in the versions of the Diagnostic and Statistical Manual of Mental Disorders (DSM) published since 2000. *Id.* at 188.

[7] In appointing the guardian ad litem, Judge Tucker stated the following:

> We're going to go ahead and appoint Mr. Nelson as her guardian ad litem. The Public Defender's Office will reappoint conflict counsel from this point. And that will allow Mr. Nelson to participate as he's available, potentially in those discussions after the visits, and to also give feedback to the Court on the guardian ad litem level about maybe what her needs are. But really the – the test is going to be how well she does in her mental health and if that's going to help. And if her therapy, you know, is going to help her build a better rapport with the Department and make more meaningful visits, because she's kind of starting from square one.

purpose of appointing the guardian was "to participate" in Mother's visits and "to also give feedback to the [c]ourt on the guardian ad litem level about maybe what her needs are." When Mother returned to the courtroom, the court spoke with her about a proposed behavior contract to address the issues that had arisen during visits. Mother agreed to the behavior contract, but continued to be disruptive with and disrespectful to the court.

Despite the behavior contract, supervised visits ended abruptly soon after the status hearing in November 2017. On December 13, 2017, Mother's escalating behavior caused the Department to suspend in-person visits. During this visit, Mother discovered mold in the lid of Son's sippy cup, and responded by going "ballistic." She began to yell and swear at facility workers, threatening the visitation technicians with violence and using racial slurs. This occurred in the presence of other children and their visiting families. The security guard eventually escorted Mother from the facility. The Department suspended weekly visitation at the facility and planned to arrange video visitation.

On December 21, 2017, the six-month review hearing was held. The court took notice of the disruption Mother had caused at a separate hearing two days prior, involving several of Wife's children and a different father. Mother had been escorted from the courthouse by two bailiffs at that time. As a result, the decision was made to separate Son's case from the case of the two other children who had been removed from Father and Wife's home in July 2017.

On January 16, 2018, a status hearing was held. During this hearing, both Mother's counsel and guardian ad litem requested that the court appoint a different guardian ad litem for Mother. In particular, Mother's counsel observed that Mother's most aggressive behavior had occurred at the visits during which the guardian ad litem was not present, and argued that these visits should not be counted against Mother. Mother's guardian ad litem also noted that he, as Mother's former appointed counsel in this case, might face a conflict of interest if called as a fact witness at subsequent proceedings. The court reiterated the reason it had appointed Mother a guardian ad litem had been to improve Mother's rapport with the Department, but indicated that Mother should take more responsibility in communicating with the Department. However, the court acknowledged the potential conflict of interest and stated that it would accordingly relieve the current guardian ad litem from that responsibility. The court stated that there was a "need to appoint a different person to act as guardian ad litem until we have further direction from" a

Judge Tucker then appointed Jolene Maloney as Mother's "conflict" counsel.

7

mental health evaluator to determine if a new guardian ad litem would be necessary. Notwithstanding the court's recognition that a different person needed to be appointed guardian ad litem for Mother, no substitute guardian ad litem was ever appointed.

During the January 2018 hearing, Mother was particularly disruptive. She was especially upset about the difficulty in setting up and maintaining video visitation with Son. She complained that she did not have internet access, the proper platform, or the right technology. However, at the same time, Mother was live-streaming the hearing on her Facebook page through her phone. The court admonished Mother for this. Nevertheless, Mother continued to disrupt the hearing until it concluded.

On April 19, 2018, Mother underwent another psychological evaluation, this time with Dr. Book, which was cut short after Mother became angry, hostile, and belligerent when she was asked to complete a particular subtest. After Mother left Book's office, Book contacted the Department to report his concerns about Mother's "quick emotional escalation, confusion about why she was agitated so easily, [his] encouragement for her to return and complete testing, [his] concerns about significant cognitive impairment and unknown potential for future violence." Book's diagnostic impressions were that Mother was suffering from schizophrenia, paranoid type, and a mild neurocognitive disorder. He recommended that Mother "reengage[ ] with a multidisciplinary counseling agency to stabilize severely emotionally disturbed behavior and emotions[.]" Book concluded:

> In no way do I believe that this individual is safe and stable to take care of herself, let alone be responsible for any minor children at this time. I have every concern about her history of erratic, hostile behavior and am concerned that she may have underlying physical and brain insults that are largely contributing to her status.
>
> [Mother] needs help immediately to keep herself and the community safe. I have expressed these concerns to [Department] staff.

On August 24, 2018, Mother underwent a third psychological evaluation with Dr. Nordstrom. This was the only psychological evaluation Mother completed. Nordstrom observed that Mother was "a questionable historian; often placing herself in the role of 'victim' and failing to accept responsibility for her actions." Nordstrom observed that Mother's personality inventory (MMPI-2) yielded

> intentional overreporting of extreme symptoms in individuals with psychopathology. Her Clinical Scales revealed Psychotic symptoms, including delusions of persecution and ideas of reference . . . along with somatic complaints

8

and/or complaints of chronic pain . . . moderate depression, worry, and somatic complaints . . . and a schizoid lifestyle, unusual beliefs, eccentric behaviors, confusion fantasy and daydreaming[.]

Nordstrom's diagnostic impressions included major depression, with a provisional diagnosis of chronic posttraumatic stress disorder, and personality disorder, unspecified, as suggested by paranoia, unstable relationships, and a repeated history of abuse. Nordstrom recommended that Mother "involve herself in regular, individual counseling to address her longstanding history of trauma and abuse and the impact that this has on her current psychological functioning." In addition, Nordstrom noted that "[b]ased upon [Mother's] history and current presentation, strong concerns exist regarding [her] ability to effectively parent a child."

As for Mother's interaction with Son, video visitation was inconsistent after January 2018, with varying levels of engagement. Mother frequently cancelled, did not confirm, or did not call for her video visitation. Several visits were cut short by Mother, or interrupted by Mother's escalating behavior. Mother was consistently disruptive in the status hearings that followed. She was argumentative and defensive, especially when counsel and the court discussed her efforts to seek psychological evaluation and treatment. She was excused from the courtroom during one hearing because she disrupted testimony. Mother had one supervised visit in November 2018.

On November 13, 2018, Mother's guardian ad litem, Nelson, was formally removed. There was no replacement guardian ad litem appointed. There was also no accompanying documentation or discussion about the impact of the various mental health evaluations on Mother's need for a guardian ad litem.

### E. The Department petitions to terminate, Mother executes the consent form, the court rejects Mother's attempt to rescind her consent, and the court renders its decision.

Despite Mother being informed of the steps she needed to take in order to resume in-person visitations, she did not comply with them. She was required to complete a psychological evaluation, and was seen by three psychologists, only one of whom was able to complete an assessment without needing to discontinue it. Throughout this time, Mother could not show that she was attending therapy.

On June 5, 2018, a review and permanency hearing was held before Judge Tucker. At this hearing, Judge Tucker approved a change of permanency goal from reunification to termination of parental rights and adoption, with reunification as a secondary goal, observing that Mother

had "been completely uncooperative" with the "fundamental focus of the case plan[,]" which was to have her address her mental health issues.

Between June 2018 and February 2019, Mother completed eleven video visits, including one in-person visit for Son's birthday, and cancelled or did not show for seventeen video visits. She gave birth to her fifth child in August 2018.

After the successful in-person visit in November 2018, the parties reported to the court that they had developed an agreement for Mother to complete so that in-person visits could resume. These requirements included participation in regular drug testing, psychological counseling, and undergoing a Global Appraisal of Individual Needs (GAIN) to determine whether Mother needed drug and alcohol treatment.

An earlier attempt to have Mother undergo a GAIN ended unsuccessfully after Mother became physically aggressive and threatened to harm the Department's Drug and Alcohol liaison. Mother evidently was reacting to misinformation about her newborn child (born in August 2018) that had been relayed by a Department case manager who had apparently misread the drug test results for both Mother and her newborn. The case manager had mistakenly stated that both Mother and newborn had tested positive for cocaine, when only Mother had tested positive. When the Drug and Alcohol liaison repeated this misinformation, Mother became irate, struck the liaison, and was arrested and charged for the incident. Mother was afforded opportunities to undergo another GAIN assessment and to participate in psychological counseling. However, Mother refused to provide releases to the Department to permit monitoring of her participation in psychological counseling.

In February 2019, the Department moved to cease reasonable efforts to reunify Son and Mother and to cease visitation. The Department then petitioned to terminate Mother's parental rights. The case was set to proceed in July 2019 before Judge Krogh.

While all of the proceedings up to this point in time had been held in the Third Judicial District, on June 28, 2019, Mother executed a consent form to terminate her parental rights before Magistrate Judge Ellis in the Fourth Judicial District. Under oath, she was asked by her attorney if she had been forced to make the decision, or if she had been promised anything in exchange for her consent, to which she answered no. She indicated that the ramifications of the consent had been explained to her, and that she was requesting that the Court accept her termination of parental rights. When asked if she believed it was in Son's best interest to do so,

she answered, "[n]o, I don't think it's in his best interest, but it's in mine." She indicated that she was giving her consent to terminate her parental rights freely and voluntarily. Mother then executed the consent form. However, ten days later on July 8, 2019, Mother filed a motion to set aside her voluntary consent to termination of parental rights.[8]

Magistrate Judge Krogh held a hearing on Mother's motion on July 10, 2019. According to Mother's counsel, Mother "felt she was forced into doing the consent based upon the course of the proceedings . . . . [and] that she didn't feel she had a fair opportunity to actually reunify and successfully work her case plan." Mother's counsel first examined her and then invited her to testify in a narrative fashion. Mother indicated that her sister had committed suicide shortly before Mother executed her consent, and alluded to two individuals who had threatened her by phone, text, email, and Facebook message if she did not sign the consent form. She further testified that the Department (or the Social Worker) had threatened her that if she did not let them take Son, all of her other children would be taken away. However, when asked, Mother was evasive and unclear about the basis for her allegations, making excuses for why she could not show proof of the threats she had purportedly received. Father then testified, indicating that he had not threatened Mother to get her to terminate her rights to Son. The Department also put on several other witnesses, in particular Son's current and former social workers.

After the evidence concluded on July 10, 2019, Judge Krogh made a ruling on the record, denying Mother's motion to set aside her voluntary consent and stating it would enter written findings and conclusions. On July 15, 2019, Judge Krogh entered her written findings of fact and conclusions of law and issued an order denying Mother's motion to set aside her consent. The court found that there was "no credible evidence to support a conclusion that [Mother's] consent was the result of fraud, duress, or undue influence." The court observed that Mother appeared to understand what was occurring, had clearly read and understood the consent form, and did not appear to have executed the form as a "result of mere impulse." As a result, Mother's motion to set aside her consent was denied.

The termination trial proceeded on July 11, 2019, before Judge Krogh. Because Mother's request to set aside her consent to termination had been rejected, Mother was not allowed to participate in the termination proceedings. Judge Krogh entered her Findings of Fact, Conclusions of Law, and Order on July 16, 2019. The court found by clear and convincing

---

[8] On July 9, 2019, Father executed a consent form to terminate his parental rights before Judge Krogh.

evidence that Mother had neglected Son, and that termination of Mother's parental rights was in Son's best interest.

On July 30, 2019, Mother filed a timely expedited appeal.

## II. STANDARD OF REVIEW

"We exercise free review over the issues of law decided by the [magistrate] court to determine whether it correctly stated and applied the applicable law." *Shepherd v. Shepherd*, 161 Idaho 14, 17, 383 P.3d 693, 696 (2016) (quoting *State Dep't of Health & Welfare v. Slane*, 155 Idaho 274, 277, 311 P.3d 286, 289 (2013)). "This Court exercises free review over due process issues because they are questions of law." *Floyd v. Bd. of Ada Cty. Comm'rs*, 164 Idaho 659, 663, 434 P.3d 1265, 1269 (2019) (citation omitted).

This Court will not overturn the findings of a magistrate court unless they are clearly erroneous. *State, Dep't of Health & Welfare v. Doe*, 145 Idaho 662, 664, 182 P.3d 1196, 1198 (2008) (citing *Crum v. State, Dep't of Health & Welfare*, 111 Idaho 407, 408, 725 P.2d 112, 113 (1986)). "A finding is clearly erroneous if it is not supported by substantial and competent evidence." *Id.*

## III. ANALYSIS

### A. The form executed by Mother is not contemplated by Idaho Code section 16-2007(3) as consent to terminate her parental rights, so *Petition of Steve B.D.* does not apply to render the form irrevocable.

In denying Mother's motion to set aside the form she executed, Judge Krogh referred to this form as "consent to termination of [Mother's] parental rights." Judge Krogh cited *Petition of Steve B.D.*, 111 Idaho 285, 723 P.2d 829 (1986), for the rule that a form consenting to termination of parental rights cannot be withdrawn without a showing of fraud, duress, or undue influence. On appeal, Mother argues that the rule articulated in *Petition of Steve B.D.* is not applicable here because, unlike the form in *Petition of Steve B.D.*, the form she executed was not filed in conjunction with a petition for adoption. Mother has argued instead that the principles set forth in *Santosky v. Kramer*, 455 U.S. 745 (1982), control and that due process requires that she be given an opportunity to withdraw the form she executed. The Department responds, arguing that *Petition of Steve B.D.* is applicable because the Court there addressed the need for a standard for determining when and if a consent to terminate one's parental rights could be revoked, regardless of the proceeding in which the form was filed. *See Petition of Steve B.D.*, 111 Idaho at 290, 723 P.2d at 834.

12

The Idaho Legislature set out the statutory scheme governing termination of the parent-child relationship in Chapter 20, Title 16 of the Idaho Code. Within this chapter, two forms are set forth, addressing separate processes related to termination proceedings. Section 16-2005(4) contemplates a voluntary *consent to terminate* one's parental rights filed in conjunction with a petition for *adoption*. *See* I.C. § 16-2005(4). Section 16-2007(3), on the other hand, contemplates *waiver of notice and appearance* in a termination proceeding. *See* I.C. § 16-2007(3).

In order for a form under either statute to be valid, the form must "be substantially in the . . . form" set out in each statute. *See* I.C. §§ 16-2005(4), 16-2007(3). A close reading of the forms indicates they fulfill two very different purposes: one form results in the parent consenting to termination of her parental rights in the context of an adoption, while the other form waives the parent's right to notice and an opportunity to appear in a termination proceeding. The form set out in Idaho Code section 16-2005(4) requires the parent "give [her] full and free consent to the complete and absolute termination of [her] parental right(s)." Consent in this statute is only in the context of adoption. The form set out in Idaho Code section 16-2007(3) results in the parent waiving her "right to notice and [her] right to appear in any action seeking termination of [her] parental rights."

The Department assumes that the statute under which Mother purportedly executed the consent form was Idaho Code section 16-2005(4). This assumption is misplaced. Based on its text, the form Mother executed purports to serve the function of *both* forms contemplated by Idaho Code sections 16-2005(4) and 16-2007(3): it claims to give "full and free consent to the complete and absolute termination of my parental rights to the said child[,]" "request[s] that the . . . court terminate my parental rights to said child[,]" and waives "all notice of hearings and appearances" regarding termination or adoption proceedings. However, the form signed by Mother may not be used under these circumstances. The form created by the legislature in Idaho Code section 16-2005(4), in which the signer "consents" to the termination of her parental rights *may not* be used *unless* the termination of that parent's rights results in an *adoption*. It is inappropriate to combine the two forms, as was done here, because the forms created by the legislature are designed to deal with two different scenarios. Idaho Code section 16-2005(4) is the exclusive form to be used when the child is being adopted. Since Son was not being adopted, Mother should not have been asked to consent to the termination of her parental rights. Idaho

13

Code section 16-2007(3) was the only operative statute and the form provided in that statute should have been the form used.

By its own language, Idaho Code section 16-2007(3) does not result in the termination of a parent's rights. Its text recognizes that the *consequence* of the waiver *may* be termination: "I . . . understand that by waiving notice and appearance my . . . parental right(s) . . . *may* be completely and forever terminated[.]" *Id.* (italics added). However, it does not contain the word "consent." Nor does it envision direct termination of the parent's rights. There is a significant difference between relinquishing by consent a *substantive* due process right, i.e., the right to parent, and waiver of a *procedural* due process right, i.e., the right to notice of a proceeding and an opportunity to be heard. Consent to terminate is vastly different from a waiver of notice and an opportunity to be heard. Joinder of the two forms is therefore inappropriate and not sanctioned by the legislature.

The legislature clearly perceived the distinction between these forms and their corresponding contexts. Idaho Code section 16-2005(5) explicitly requires a hearing to be held "[u]nless a consent to termination signed by the parent(s) of the child has been filed by an adoption agency licensed in the state of Idaho, or unless the consent to termination was filed in conjunction with a petition for adoption of the child[.]" I.C. § 16-2005(5). Where consent to termination is filed in the context of an adoption, "no subsequent hearing on the merits of the petition shall be held." I.C. § 16-2005(4). Outside the context of an adoption, a hearing on the merits of termination is *absolutely required*, even if a parent has waived her right to notice and an opportunity to be heard at that hearing. We note that in the adoption context, there is a different need for finality than where a parent is waiving notice and an opportunity to be heard. The standard to be applied in an adoption where a parent wants to undo her consent to the adoption is more stringent; the consent is irrevocable absent a showing of "fraud, duress or undue influence." *Petition of Steve B.D.*, 111 Idaho at 292, 723 P.2d at 836. However, because the form Mother executed *here* could statutorily only waive her right to notice and an opportunity to be heard in the termination proceeding against her, the standard of review set out in *Petition of Steve B.D.* does not apply. 111 Idaho at 292, 723 P.2d at 836. Accordingly, the magistrate court erred as a matter of law by applying the test set out in *Petition of Steve B.D.* to render Mother's consent to terminate irrevocable. As a result, remand is necessary.

In addition, this disposition was procedurally defective because of the ways in which Mother's mental illness was handled. In November 2017, Judge Tucker appointed a guardian ad litem for Mother as part of a joint effort between Mother's counsel and the Department to improve Mother's rapport with the Department. By January 2018, issues arose surrounding the role of the guardian ad litem. In particular, Nelson was concerned about a potential conflict of interest in the event he was called as a fact witness in criminal proceedings brought against Mother. (Nelson was also doubtful about his ability to continue participating in Mother's visits with Son.) Mother's counsel, Maloney, also voiced concerns about Mother's psychological condition:

> I am going to ask that we . . . consider reappointing a guardian because Mr. Nelson previously, as her attorney, determined that she needed one. And until we have some specific information from a therapist . . . who would indicate that that's not appropriate, I think we have to proceed assuming that that's correct.

Accordingly, Maloney and Nelson together asked that a replacement guardian ad litem be appointed until the results of a psychological assessment could be reviewed to see if Mother no longer needed a guardian ad litem. In response, Judge Tucker clarified that she had seen Nelson's role "more of an assistant to help with communication, but not necessarily needed in regards to any type of disability or needs in that way[.]" However, she stated,

> *we will need to appoint a different person to act as guardian ad litem until we have further direction from [the evaluating psychologist]* and whether or not that continued appointment is necessary. If the goal is just to assist [Mother] with communication with the Department, I think that can be achieved in other ways.

(Italics added.)

Judge Tucker recognized that it was unclear whether Mother needed a guardian ad litem to speak for her in the proceedings. Judge Tucker articulated the need to appoint a replacement guardian ad litem until a mental health evaluation provided further direction. In other words, *appointment* of a guardian ad litem was not contingent upon the mental health evaluation; *removal* of a guardian ad litem was contingent upon the mental health evaluation demonstrating that Mother did not need a guardian ad litem. However, Nelson was formally removed ten months later, in November 2018, without discussion or determination on the record as to why a replacement guardian ad litem was never appointed.

This failure to appoint a replacement guardian ad litem under these circumstances constituted error. At the time Mother executed the waiver, there was still an outstanding

question, recognized but not addressed by the magistrate court, as to Mother's need for a guardian ad litem. This outstanding question hinged upon the results of Mother's psychological evaluations, but was never answered despite the availability of these results. It is clear that Mother suffered from significant mental illness.[9] One magistrate judge previously recognized the need for a guardian ad litem to voice what would be in Mother's best interest. However, having identified the earlier need for a guardian ad litem and the continuing need to have a guardian ad litem absent receiving evidence to the contrary, a replacement guardian was never appointed. There is substantial and competent evidence strongly indicating Mother's ongoing need for a guardian ad litem. Consequently, the magistrate court erred as a matter of law by failing to appoint a guardian ad litem under these facts.

## IV. CONCLUSION

For the reasons stated, we vacate the judgment of the magistrate court terminating Mother's parental rights and remand for further proceedings.

Chief Justice BURDICK, Justices BRODY, BEVAN and MOELLER CONCUR.

---

[9] According to various mental health evaluations performed over the course of these proceedings, the evaluating professionals provided diagnostic impressions of paranoid schizophrenia, an unspecified personality disorder marked by paranoia and unstable relationships, and schizoaffective disorder (bipolar type). Dr. Firth commented that Mother was "lost in the real world and in denial as to her condition thinking everyone else is wrong and out to get her." Another evaluating professional, Dr. Book, stated, "[i]n no way do I believe that this individual is safe and stable to take care of herself, let alone be responsible for any minor children at this time. I have every concern about her history of erratic, hostile behavior and am concerned that she may have underlying physical and brain insults that are largely contributing to her status." Noting that Mother self-reported "psychotic symptoms, including delusions of persecution and ideas of reference[,]" Dr. Nordstrom "strongly recommended [Mother] involve herself in regular, individual counseling to address her longstanding history of trauma and abuse and the impact that this has on her current psychological functioning." Despite these diagnoses being in the record, Mother was not appointed a guardian ad litem.